[Civ. No. 22559. Third Dist. Aug. 13, 1985.]

STEELGARD, INC., Plaintiff and Appellant, v.
DAVID JANNSEN, as Director, etc., et al., Defendants and Respondents;
GARY DOUPNIK MANUFACTURING, INC.,
Intervener and Respondent;
AURORA MODULAR INDUSTRIES et al.,
Real Parties in Interest and Respondents.

**COUNSEL**

Tonsing & Heimann and Richard M. Heimann for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, and Robert L. Mukai, Deputy Attorney General, for Defendants and Respondents.

Gerald W. Nash for Intervener and Respondent and for Real Parties in Interest and Respondents.

**OPINION**

**CARR, Acting P. J.**—Plaintiff Steelgard, Inc. (Steelgard) appeals from the order denying a peremptory writ of mandate to prohibit the State Department of General Services (Department) from awarding certain contracts for the purchase of portable classrooms and to direct it to procure such classrooms under the provisions of the State Contract Act. (Ch. 1 (commencing with § 10100), pt. 2, div. 2 of the Pub. Contract Code.) Essentially Steelgard contends the Department when purchasing portable classrooms pursuant to the Emergency School Classroom Law of 1979 (ch. 25 (commencing with § 17785), pt. 9, div. 1, tit. 1 of the Ed. Code) must follow the State Contract Act's (Pub. Contract Code, § 10100 et seq.) bidding procedures for state construction contracts rather than the bidding procedures for the procurement of materials, supplies, and equipment. (Gov. Code, § 14780 et seq.)[1] The latter procedures were employed by the Department

---

[1]The provisions of what the parties refer to as the "State Purchasing Act" (Gov. Code, § 14780 et seq.) were, in 1983, reenacted and placed in the new Public Contract Code (Stats. 1983, ch. 1231, § 4) urgency effective September 30, 1983; formerly at ch. 6 (commencing with § 14780, pt. 5.5, div. 3, tit. 2 of the Gov. Code) and the Government Code sections repealed. The language of the new Public Contract Code, as relevant herein, is substantially the same as the former Government Code.

The State Contract Act, now found in sections 10100-10284 of the Public Contract Code was formerly found in the Government Code, section 14250 et seq. It became effective as part of the Public Contract Code on January 1, 1982 (Stats. 1981, ch. 306), at an earlier

in the procurement of the portable classrooms in question. For reasons herein stated we shall affirm.

## FACTS

In May 1982, the Department's Office of Procurement issued invitations for bids for the purchase of approximately 270 portable school classroom facilities. Thirteen bids were received. Steelgard, a manufacturer of factory-built portable buildings, was one of the bidders. On June 30, the office of procurement announced its proposed contract awards. Steelgard was the low bidder on five buildings and was to receive a contract only on this portion of the total contract. Prior to this announcement, Steelgard protested the bidding procedures on the ground the office was required to conduct bidding in accordance with the State Contract Act, not the purchasing act. The Board rejected Steelgard's protest as beyond its jurisdiction.

Steelgard then filed its "petition for writ of mandate and/or prohibition" seeking to prohibit defendants David Jannsen, Director of the Department of General Services, and John Babich, Chief of the Department's Office of Procurement, from awarding any contracts pursuant to the invitations for bids and to compel them to resolicit bids and award the contracts under the State Contract Act. Steelgard alleged it believes it would have been awarded a substantial portion of the contracts if bids had been solicited under the State Contract Act.

The trial court issued an "alternative writ of mandate and prohibition" prohibiting defendants from issuing the subject contracts and directing them to solicit bids pursuant to the procedures of the State Contract Act, or in the alternative to show cause on July 30 why they have not done so.[2]

On the same day, the office of procurement issued two purchase orders for 106 portable classrooms, totaling $2,121,172 to intervener Gary Doupnik Manufacturing, Inc., and real party in interest Aurora Modular Industries. After settling other bid protests, the office of procurement issued purchase orders for 86 portable classrooms, totaling $1,763,850, to National Mobile Space, Inc., another real party in interest, and for five portable classrooms, totaling $97,500, to Steelgard. National Mobile Space, Inc. was

day than the new State Purchasing Act contained in Public Contract Code, sections 10290-10430.

[2]To the extent the writ purports to be prohibitory, it is misnamed. A writ of prohibition may only be issued to restrain actions of agencies exercising judicial power. (Code Civ. Proc., § 1102; *Whitten* v. *California State Board of Optometry* (1937) 8 Cal.2d 444, 445 [65 P.2d 1296, 115 A.L.R. 1].) However, as to its prohibitory aspects, we may properly view the writ as one of "prohibitory" mandate. (*Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 970, fn. 1 [137 Cal.Rptr. 699].)

awarded an additional contract for 20 buildings in the amount of $399,598; and Aurora Modular Industries was awarded an additional contract for 29 buildings in the amount of $563,847.

After a hearing, the trial court denied Steelgard's petition for a writ of mandate and prohibition and discharged the alternative writ. The court concluded the office of procurement properly solicited bids for the purchase of portable classrooms under the provisions of the State Purchasing Act governing procurements of materials, supplies and equipment. This appeal followed.

## DISCUSSION

A writ of mandate lies "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; . . ." (Code Civ. Proc., § 1085.) " 'Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually ministerial duty upon the part of the respondent [citations]; and ▮ a clear, present and beneficial right in the petitioner to the performance of that duty [citation].' [Citation.]" (*Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 863 [132 Cal.Rptr. 464, 553 P.2d 624].)

As to the petitioner's interest, the writ may not be issued where the injury is purely theoretical and the petitioner fails to show any benefit would accrue to him if the writ were issued, or that he will suffer any detriment if it is denied. (*Parker* v. *Bowron* (1953) 40 Cal.2d 344, 351-352 [254 P.2d 6]; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 61, p. 3838.)

The central issue, as noted, is whether defendants had a duty to utilize the bidding procedures of the State Contract Act (Pub. Contract Code, § 10100 et seq.) in purchasing portable classrooms under the authority of the Emergency School Classroom Law of 1979. Defendants contend they properly utilized the bidding procedures which govern the procurement of materials, supplies, and equipment. (Gov. Code, § 14780 et seq.; now Pub. Contract Code, § 10290 et seq.)[3]

---

[3]At trial, intervener raised additional issues as to Steelgard's standing, the timeliness of the petition, estoppel and unclean hands. The trial court did not reach these issues, but based its decision on a determination of the merits of the central issue. We shall do the same. In enacting the Emergency School Classroom Law, the Legislature recognized the ad valorem tax is no longer available as a source of revenue for the construction of school facilities. (Ed. Code, § 17786.) The Legislature found "the greatest need in school construction is for classrooms" and adopted the Classroom Law with the intent "to satisfy this primary need to the greatest extent possible before providing any additional educational facilities, . . ." (*Ibid.*) Evidence at trial revealed the urgent need for portable classroom facilities. The issue of what law defendants must follow in obtaining such facilities is therefore of great public interest and is likely to recur. Accordingly, we shall determine this issue.

The Emergency School Classroom Law of 1979 invests in the State Allocation Board (Board) the power and duty to "[h]ave constructed, furnished, equipped, or otherwise require whatever work is necessary to place, portable classrooms on school sites where needed." (Ed. Code, § 17788, subd. (d).) From moneys available in the State School Building Aid Fund, the Board "shall make available to the Director of General Services such amounts as it determines necessary to provide the assistance" necessary to procure portable classrooms. (Ed. Code, § 17788, subd. (f).)

The Board must use "performance specifications for portable classrooms complying with Sections 39140 to 39156 [of the Education Code], inclusive, which are capable of being economically moved, and *bids for the construction of which can be solicited from more than one responsible bidder.* The board shall from time to time solicit bids from, and award to, the *lowest responsible competitive bidder,* contracts for the construction or purchase of only such numbers of portable classrooms as have been approved for lease to eligible school districts and county superintendents of schools." (Ed. Code, § 17793; italics added.)

Regulations implementing the Emergency School Classroom Law appear at chapter 3 of title 2 of the California Administrative Code (commencing with § 1862.50). These regulations define "portable classrooms" as "[s]ingle classroom factory-built buildings which are constructed in accordance with performance specifications adopted by the Board." (Cal. Admin. Code, tit. 2, § 1862.50.) When the need arises, the Board may "authorize the Office of Procurement of the Department of General Services to acquire portable classrooms for lease to eligible districts." (Cal. Admin. Code, tit. 2, § 1862.51.)

The performance specifications, with which the Board must comply, appear at article 3 (commencing with § 39140) chapter 2, part 23, division 3, title 2 of the Education Code. The procedures set forth provide for the approval of school building construction by the Department of General Services and require the Department to supervise the design and construction of any school building "to ensure that plans and specifications comply with the rules and regulations adopted pursuant to this article and building standards published in Title 24 of the California Administrative Code, and to ensure that the work of construction has been performed in accordance with the approved plans and specifications, for the protection of life and property."[4]

Before commencement of any fabrication, construction, or alteration of a portable school building of a type previously approved by the Department, the Department must give its written approval of the plans as to the safety and design of construction. (Ed. Code, § 39144.5.)

Article 5 of the Education Code (commencing with § 39190) provides an alternative procedure to article 3 for the approval of construction and installation of factory-built school buildings not over 1,000 square feet in area.[5] Such buildings are defined as "any building designed or intended for use as a school building which is either wholly manufactured or is in substantial part manufactured at an offsite location in accordance with building standards adopted and approved pursuant to Chapter 4 (commencing with Section 18935) of Part 2.5 of Division 13 of the Health and Safety Code and other regulations adopted by the Department of General Services, to be assembled or erected on a school site." (Ed. Code, § 39190.)

Regulations adopted by the Department must at least comply with the building standards required by articles 2 and 3 of the Education Code. (Ed. Code, § 39191.)[6]

Article 5 permits a manufacturer of portable classrooms to submit its plans, specifications, and methods of construction to the Department for approval. Once the Department gives its approval, a school district which is otherwise required by articles 2 or 3 to submit plans and specifications of a proposed school building for the Department's approval, may, instead, include in its application for approval a notification that it intends to utilize an approved factory-built school building. Before granting its approval for use of such a building the Department must insure the plans, specifications, and methods of construction have been approved and comply with the standards then in effect. If so, the application may be approved. (Ed. Code, § 39197.)

The purpose of these provisions is to streamline the approval process by permitting the Department to approve the use of factory-built school structures that comply with a manufacturer's previously approved plans, specifications, and methods of construction, rather than requiring individual school districts to submit separate plans and specifications for approval each time they wish to utilize such factory-built facilities. (Leg. Counsel's Dig. of Assem. Bill No. 1846, 2 Stats. 1972 (Reg. Sess.) Summary Dig., p. 209.)

---

[5] The portable classrooms in this case are 960 square feet in area.

[6] Article 2 (commencing with § 39110) governs the development and approval of plans and specifications for one-story schoolhouses of not more than nine classrooms.

Although it specifies the standards under which portable classrooms must be manufactured, the Emergency School Classroom Law of 1979 prescribes no specific statutory procedure by which they must be purchased. The law requires only that bids be solicited from, and contracts be awarded to, "the lowest responsible competitive bidder." (Ed. Code, § 17793.)

We review first those provisions which govern state procurement of materials, supplies, equipment, and services, under which the Department proceeded in this case.

Government Code section 14780 (presently enacted as § 10295 of the Pub. Contract Code) provided in relevant part: "All contracts entered into by any state agency for (a) the hiring or purchase of equipment, supplies, materials, or of textbooks for use in the day and evening elementary schools of the state, . . . (c) the construction, alteration, improvement, repair or maintenance of property, real or personal, . . . are of no effect unless and until approved by the Department of General Services. . . . *This section shall not apply to any contract let by a department under the State Contract Act* . . . ." (Italics added.)

Government Code section 14807 et seq. (presently enacted as art. 3 (commencing with § 10300) ch. 2, pt. 2 of the Pub. Contract Code) provided for competitive bidding in the procurement of materials, supplies, and equipment under Government Code section 14780. Except where an article of a specified brand is the only one which will meet the needs of the agency, "all contracts and purchases of supplies in an amount of [$5,000] or more shall be made or entered into with the lowest responsible bidder meeting specifications." (Gov. Code, § 14807.)

Whenever the Department purchases supplies or equipment in excess of $5,000, all vendors who have notified the Department in writing of their desire to bid on such supplies or equipment, and who have been prequalified, shall be furnished with specifications of the supplies or equipment to be purchased. In addition, the Department must post a copy of such specifications in a public place until seven days after an award has been made. (Gov. Code, § 14809.)

The Department must adopt uniform standards of rating bidders, based on questionnaires and required statements, with respect to contracts upon which each bidder is qualified to bid. (Gov. Code, § 14810.)

Bids must be sealed and are publicly opened. They are publicly read if any person present so desires. (Gov. Code, § 14811.) After bids are opened, they are available for public inspection. (Gov. Code, § 14812.)

Prior to the award, a protest may be filed with the Department against the award on the ground that the protester is the lowest responsible bidder meeting specifications. (Gov. Code, § 14813.)

As clearly stated in Government Code section 14780, its provisions do not apply to transactions entered into under the State Contract Act.

The State Contract Act applies to "projects." Projects are defined to include "the erection, construction, alteration, repair or improvement of any state structure, building, road, or other state improvement of any kind which will exceed in cost a total of [$25,000]." (Pub. Contract Code, § 10105.) The State Contract Act expressly does not apply to "[c]ontracts for the purchase of supplies or materials, which are purchased pursuant to Chapter 2 (commencing with section 10290), . . . *even though the seller is required to perform some incidental work or service in connection with the delivery of the material or supplies.*" (Pub. Contract Code, § 10101; italics added.)

The State Contract Act as well requires the award of contracts to the lowest responsible bidder. (Pub. Contract Code, § 10122.) Public notice of a project must be given by publication once a week for two consecutive weeks in a newspaper of general circulation in the county, and in a trade paper of general circulation. (Pub. Contract Code, § 10140.) Prospective bidders must prequalify by completing a questionnaire and financial statement as to their financial ability and experience in performing public works. (Pub. Contract Code, § 10160.) The Department must adopt a uniform system of rating bidders on the basis of the questionnaires and financial statements. (Pub. Contract Code, § 10163.) Bid forms shall not be provided to those who have not submitted required forms for prequalification at least five days before the date of opening the bids. (Pub. Contract Code, § 10166.) Bids must be accompanied by 10 percent of the bid amount. (Pub. Contract Code, § 10167.) On the day named in the public notice the Department shall publicly open the bids and award the contract to the lowest responsible bidder. (Pub. Contract Code, § 10180.) If the director of the Department deems acceptance of the lowest responsible bid is not in the best interests of the state, he may reject all bids. (Pub. Contract Code, § 10185.)

Other provisions in the State Contract Act require specific provisions be included in every contract and provide for relief from bid mistakes, for resolution of contract disputes, for modification, performance, and payment of contracts, and delineate certain criminal offenses and the punishment therefor. (Pub. Contract Code, §§ 10200-10265.)

With certain exceptions, not pertinent to the issue before us, the provisions of the State Contract Act are stated in mandatory rather than directory

terms. The language of the act "makes quite clear that the Legislature intended the statutory requirements to be obligatory rather than permissive." (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 910 [136 Cal.Rptr. 251, 559 P.2d 606].) If the procurement of portable classrooms must be considered a "project," as defined by Public Contract Code section 10105, the Department has a duty to proceed under the State Contract Act.

To the extent the Department and the trial court infer the Department's selection of statutes under which to proceed was an exercise of "discretion," they are mistaken. The Department has no discretion if a project clearly comes within the State Contract Act. However, Public Contract Code section 10101, in describing those transactions not covered by the State Contract Act, is somewhat ambiguous and admits of some degree of administrative interpretation. Therefore, the question before us is whether, as a matter of law, the Department correctly interpreted its duty as to the proper statute under which to procure portable classrooms.

■ It is a well-established rule of statutory construction that "'[t]he contemporaneous and practical construction of a statute by those whose duty it is to carry it into effect, while not controlling, is always given great respect. And a contemporaneous interpretation long acquiesced in by all persons who could possibly have an interest in the matter, has been held to be sufficient to justify a court in resolving any doubt it might have as to the meaning of ambiguous language employed by the legislature, in favor of sustaining such long unquestioned interpretation.'" (*People* v. *Southern Pac. Co.* (1930) 209 Cal. 578, 594-595 [290 P. 25].) Under these circumstances, the administrative practice will be upheld "'unless it is *clearly* erroneous or unauthorized.'" (*Richfield Oil Corp.* v. *Crawford* (1952) 39 Cal.2d 729, 736 [249 P.2d 600], italics added; see also *Los Angeles* v. *Superior Court* (1941) 17 Cal.2d 707, 712 [112 P.2d 10]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722]; *Castenada* v. *Holcomb* (1981) 114 Cal.App.3d 939, 945-946 [170 Cal.Rptr. 875].)

■ In determining whether a transaction involves "incidental work or service in connection with the delivery of . . . materials or supplies" and therefore not governed by the State Contract Act, the office of procurement considers what percentage of the contract price is allocatable to the on-site installation of the materials in question. Where installation does not comprise more than 10 percent of the total contract price, the office considers this work "incidental" and therefore not subject to the State Contract Act. Where installation work comprises more than 10 percent but less than 50 percent of the contract price, the transaction is evaluated on an individual basis to determine the most appropriate means of procurement. Based on its experience with purchasing factory-built portable buildings, the office has

determined that installation of such buildings consistently comprises a very small portion of their total cost. This is supported by evidence that installation or removal of a portable classroom takes less than a day and costs only $400-$500 out of a total purchase price of $20,000.

The office also takes into account the differences between the materials procurement procedures and the procedures under the State Contract Act. The latter procedures are more burdensome, less flexible, more time consuming, and more expensive than the procurement procedures. The State Contract Act requires newspaper and trade paper publication of bid invitations. (Pub. Contract Code, § 10140.) Bidders must be prequalified and must have valid contractors' licenses. (Pub. Contract Code, §§ 10160-10166.) Each contract must be approved by the Attorney General or other authorized attorney. (Pub. Contract Code, § 10220.) The State Contract Act contains extensive and detailed provisions relating to plans and specifications; relief of bidders; specific contract requirements concerning bonds; time for completion of work; changes in plans and specifications; compliance with air pollution control laws; labor relations; resolution of contract claims; creation of a public works arbitration committee; modifications, performance and payment of the contracts; and criminal offenses. (Pub. Contract Code, §§ 10120-10128; 10200-10284.)

In contrast, the materials procurement procedures are less formal and time-consuming. The office of procurement utilizes a system for prequalifying bidders (Cal. Admin. Code, tit. 2, § 1890), but a bidder who is otherwise qualified may bid on and be awarded a contract without being prequalified. (Pub. Contract Code, § 10303.) There is no requirement that a manufacturer of portable buildings be a licensed contractor, but a licensed contractor must install the buildings. Although its procedures are less formal, the office takes steps to insure contracts are awarded to competent and responsible manufacturers of portable buildings. When a bidder is not prequalified, the office evaluates its competence, experience, and financial ability. Moreover, awardees must furnish a performance bond of 25 percent of the contract price. The awardee must have complete plans and specifications prepared by a licensed engineer or architect and such plans must be approved by the Office of the State Architect. The buildings must be installed by a licensed contractor. They must be constructed in compliance with the standards required by the Education Code, including the state building codes. (Ed. Code, § 17793.)

The office of procurement has purchased portable classrooms under this procedure since 1967. Steelgard has frequently submitted bids and received awards under this procedure without complaint since the enactment of the Emergency School Classroom Law of 1979. During that time, Steelgard

was awarded 13 contracts for a total of 142 portable buildings. During its 11 years dealing with the office of procurement, Steelgard has submitted 1,000 to 1,500 bids on portable buildings and has been successful in approximately 80 percent of those bids, without apparent complaint.

It is a reasonable conclusion that these portable classrooms are within the definition of materials or supplies which involve only incidental on-site installation and that they are therefore not within the purview of the State Contract Act. They are prefabricated in factories. Only a small portion of the time, cost, and labor involves on-site installation. Both by statutory definition and in reality, the buildings are easily relocatable, installed on wood rather than permanent foundations. (Ed. Code, §§ 17793, 39190.) The state pays sales taxes on the items as it would with other materials or supplies.

Steelgard contends portable classrooms cannot be put into the same category as "nuts and bolts and pencils and paper," items which are more commonly thought of as "materials and supplies." But without a statutory definition of these terms, we cannot assume mere size necessarily removes an item from these categories. The regulations of the Office of Procurement recognize that the "products" purchased by that Office may "require[] manufacture or fabrication to specifications established by the State, . . ." (Cal. Admin. Code, tit. 2, § 1890, subd. (b)(8).) A "product" is defined as "unmanufactured, partially manufactured or finished materials, supplies and equipment." (Cal. Admin. Code, tit. 2, § 1890, subd. (a)(3).) The office clearly considers materials and supplies to be more than mere "nuts and bolts."

The regulations implementing the Emergency School Classroom Law permit the board of allocation to "authorize the *Office of Procurement* of the Department of General Services to acquire portable classrooms for lease to eligible districts." (Cal. Admin. Code, tit. 2, § 1862.51, subd. (a), italics added.) The Office of Procurement purchases only materials, supplies, and equipment for state agencies. It does not procure construction contracts under the State Contract Act. The Board, which is charged with administering the Emergency School Classroom Law, also contemplates that classrooms will be acquired under the procurement provisions of the Public Contract Code.

The State Contract Act, with its detailed provisions concerning plans and specifications, prequalification, labor, bonding, contract provisions, dispute resolution, and criminal penalties, clearly connotes application to something more than the small, prefabricated, and impermanent structures involved in this case. These structures do not require the extensive individual scrutiny

necessary for fixed, permanent public works structures subject to the State Contract Act. The Education Code provisions which provide school districts a streamlined procedure for the approval of the use of portable classrooms (Ed. Code, §§ 39190-39200) further bolsters this interpretation.

We view this as a reasonable interpretation of long standing, acquiesced in by interested parties and do not perceive the Department's approach to procuring portable classrooms is clearly erroneous or unauthorized.

Steelgard contends the characterization of portable school buildings in the Education Code compels us to find they fall within the State Contract Act as the "erection [or] construction . . . of any state structure [or] building, . . ." (Pub. Contract Code, § 10105.) Steelgard cites several provisions: (1) Education Code section 17793, which authorizes the Board to acquire portable classrooms, "bids for the *construction* of which can be solicited from more than one responsible bidder"; (2) regulations of the Emergency School Classroom Law which define portable classrooms as "single classroom factory-built buildings, which are *constructed* in accordance with performance specifications adopted by the Board"; and (3) Education Code section 39190, which defines factory-built school buildings as buildings which are manufactured off-site "to be assembled or *erected* on a school site"; and states a factory-built classroom "shall be deemed to be the *construction or alteration of a school building* as those terms are used in Article 2 . . . and Article 3 . . . of this Chapter, . . ." (Italics added.)

We find nothing in these provisions to compel the conclusion that bids for portable classrooms must be solicited under the State Contract Act or that the Department's approach is clearly erroneous. None of these provisions prescribes any statutory *method of procurement* that the Legislature intended the Department to follow under the Emergency School Classroom Law. The latter provision, in particular, is expressly limited to the Education Code sections to which it refers. It simply makes clear that the provisions of articles 2 and 3 of that chapter of Education Code, relating to the approval of plans and specifications of school buildings, applies also to factory-built school buildings.

The Emergency School Classroom Law does not unequivocally consider the acquisition of portable classrooms a construction project, for it calls upon the Board to issue contracts "for the construction *or purchase*" of portable classrooms. (Ed. Code, § 17793; italics added.) This recognizes that bids may be received from sellers or distributors of portable buildings, rather than directly from manufacturers.

The only "authority" to which Steelgard cites is not remotely on point. In *Pacific Architects Collaborative* v. *State of California* (1979) 100

Cal.App.3d 110 [166 Cal.Rptr. 184], we determined that a promise to award a contract for construction of mobilehomes for migrant workers cannot be implied under the theory of promissory estoppel when the state asks for a prototype for inspection and evaluation. We cited portions of the State Contract Act (as they formerly appeared in the Gov. Code, ch. 3 (commencing with § 14250) pt. 5, div. 3, tit. 2) in support of our conclusion, but we did not even tangentially consider the question of what statutory procedures the office of procurement must utilize in soliciting bids for portable classrooms.

Further support for the Office of Procurement's interpretation of its duty is found in the Legislature's 1983 reenactment and reorganization of the provisions governing procurement of materials, supplies and equipment. (Stats. 1983, ch. 1231, § 4.) The relevant provisions were left largely intact. There is no new provision requiring the Department to procure portable classrooms under the State Contract Act, nor any provision that portable classrooms are not materials or supplies for purposes of the bidding statutes. There has been no attempt to clarify the State Contract Act or the Emergency School Classroom Law in this respect. ■ "[L]awmakers are presumed to be aware of long-standing administrative practice and, thus, the reenactment of a provision, or the failure to substantially modify a provision, is a strong indication the administrative practice was consistent with underlying legislative intent." (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18-19 [194 Cal.Rptr. 722].)

Steelgard's petition is based solely on its belief that it would have been awarded more contracts if the Department had utilized the bidding procedures of the State Contract Act. ■ Competitive bidding statutes are not established for the benefit of bidders, but for the benefit of the public. (*Universal By-Products, Inc.* v. *City of Modesto* (1974) 43 Cal.App.3d 145, 152 [117 Cal.Rptr. 525]; *Rubino* v. *Lolli* (1970) 10 Cal.App.3d 1059, 1062 [89 Cal.Rptr. 320].) ■ The greatest failing of Steelgard's case is the lack of any evidence that the bidding procedures followed by the office of procurement do not fulfill the public purposes of the Emergency School Classroom Law or that the procedures of the State Contract Act would better fulfill them.

The procedures employed by the office of procurement resulted in the award of contracts to the lowest responsible bidders, as required by Education Code section 17793. Regardless of the bidding procedure used, portable classrooms must be manufactured and assembled in compliance with the Education Code, the regulations promulgated thereunder, and the state building codes, thereby assuring safe and adequate buildings. (*Ibid.*)

Although bidders need not be prequalified, the Office of Procurement insures that contracts are awarded only to qualified and responsible bidders. Bidders are investigated; they are required to furnish performance bonds; and their plans and specifications must be approved. Implicit in the term "lowest *responsible* bidder" is that contracts may only be awarded to bidders with the experience and financial and material resources necessary to carry them out.

There is no evidence that the intervener or real parties in interest are not responsible and fully capable of supplying portable classrooms in compliance with state specifications.

In short, Steelgard presented no evidence that the bidding procedures employed by the office of procurement failed to meet the objective of the Emergency School Classroom Law: the acquisition of safe, portable classrooms from responsible manufacturers or dealers at the lowest possible price. In fact, the evidence tended to show the procedures utilized by the office of procurement *better* meet the objectives of the Law. By avoiding the more expensive and time-consuming procedures of the State Contract Act, the office is better able to meet the emergency need for classroom facilities in a timely and less costly fashion, with no apparent reduction in the quality of the product. Competition is increased because bidders need not be licensed contractors.

Steelgard has failed to demonstrate a *clear* duty on the part of the Department to follow the bidding procedures of the State Contract Act in procuring portable classrooms under the Emergency School Classroom Law of 1979. Accordingly, Steelgard is not entitled to a peremptory writ of mandate. (*Loder* v. *Municipal Court, supra,* 17 Cal.3d at p. 863.)

Steelgard has additionally failed to show it would benefit in any respect whatsoever if the writ is granted. Steelgard presented no evidence that the intervener or real parties in interest would not be able to prequalify under the State Contract Act or that Steelgard would have been the low bidder even if they did not prequalify.[7] ▮ ▮▮▮ Steelgard has not shown a clear, personal beneficial right to the writ of mandate.[8]

---

[7]At least two awardees, Aurora Modular Industries and Gary Doupnik Manufacturing, Inc., are licensed contractors. Thus, they would be able to meet this requirement for prequalification.

[8]A citizen who shows no more interest than that of a citizen who wants the law enforced may be granted mandamus "[w]hen the duty is sharp and the public need weighty, . . ." (*McDonald* v. *Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436, 440 [111 Cal.Rptr. 637].) However, this is not such a "public interest" case. First, Steelgard has not shown "the duty is sharp and the public need weighty." Second, in its petition Steelgard alleges no interest as a citizen interested in enforcing a public right or public duty, but rather asserts an interest based solely on its "belief" that it would receive more contracts under the State Contract Act, a personal economic interest.

In essence, Steelgard urges us to reverse a longstanding and reasonable administrative practice, and compel a practice that is not clearly mandated by the law, will not demonstrably advance the public interest more effectively than the practice presently employed and will not demonstrably benefit Steelgard. Such a result would be contrary to both logic and the law.

Accordingly, the trial court properly denied Steelgard's petition for writ of mandate.

The judgment is affirmed.

Sparks, J., and Sims, J., concurred.