[No. B160520. Second Dist., Div. Three. June 29, 2004.]

PAUL G. MARSHALL, JR. et al., Plaintiffs and Respondents, v.
PASADENA UNIFIED SCHOOL DISTRICT, Defendant and Appellant;
HAYWARD CONSTRUCTION COMPANY, INC., Real Party in Interest.

1244

**COUNSEL**

Gibbs, Giden, Locher & Turner, Sharon Suarez, Peter F. Lindborg and Michael I. Giden for Defendant and Appellant.

No appearance for Plaintiffs and Respondents.

Kevin T. Snider and David Romney for Rene Amy and Schoolhouse Alliance as Amici Curiae on behalf of Plaintiffs and Respondents.

Monteleone & McCrory and Joseph A. Miller for Real Party in Interest.

## Opinion

KLEIN, P. J.—Defendant and appellant Pasadena Unified School District, a California public school district (the District), appeals a judgment granting a petition for writ of mandate filed by plaintiffs and respondents Paul G. Marshall, Jr. (Marshall) and PW Construction, Inc. (PW) (collectively, petitioners).

The District awarded a construction contract pursuant to an emergency resolution which enabled it to dispense with public bidding. The trial court set aside the District's action, finding no emergency existed.

The essential issue presented is what constitutes an emergency which allows a school district to bypass regular competitive bidding procedures.

Public Contract Code section 20113 allows a school district in an "emergency" to "[m]ake a contract . . . for the performance of labor and furnishing of materials or supplies . . . without advertising for or inviting bids."[1] Section 1102 states: " *'Emergency,' as used in this code,* means a sudden, unexpected occurrence that poses a clear and imminent danger, requiring immediate action to prevent or mitigate the loss or impairment of life, health, property, or essential public services." (Italics added.) Because section 1102 defines "emergency" for purposes of the entire Public Contract Code, its definition must be read into section 20113.

Here, there was no "sudden, unexpected occurrence" that posed a clear and imminent danger requiring prompt action to protect life, health, property or essential public services. (§ 1102.) The purported emergency herein stemmed from the District's decision to terminate a prior construction contract for its own convenience. That event did not constitute an emergency within the meaning of section 1102. The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The original contract and its termination.*

In September 2000, the District publicly advertised for bids for a project to modernize Longfellow Elementary School. The project called for (1) upgrading the electrical and plumbing systems and installing new heating, ventilation and air conditioning in a 92-year-old building, which contains 35 classrooms, and (2) constructing a new building to house six classrooms.

---

[1] All further statutory references are to the Public Contract Code, unless otherwise indicated.

B.F. Construction, Inc. (BFCI) submitted a bid for the project and was determined to be the lowest responsible bidder. On November 29, 2000, the District entered into a $5,987,500 contract with BFCI to do the work.

On December 20, 2001, BFCI wrote a letter to the District stating, inter alia: "BFCI is concerned because the project is at a standstill. [¶] One of the problems is that change orders are being 'piecemealed' and unilaterally reduced by [the construction manager]. Additionally, BFCI is not being compensated for delays, and was directed to proceed on change orders, for which it was not paid. [¶] . . . [¶] Due to the numerous changes, be advised that we are unable to proceed effectively after January 7, 2002. [¶] . . . It is our opinion that this project should be terminated for convenience by the owner, redrawn, reengineered, and put out for rebid as a possible solution for [the District] to straighten out the balance of the project."

On February 1, 2002, the District invoked its express contractual right to terminate its contract with BFCI for the convenience of the District.

2. *The dispute between BFCI and the District over the terminated contract.*

The contract between BFCI and the District provided that in the event of a termination for convenience, BFCI would be entitled to payment for "Work actually performed and in place as of the effective date of such termination . . . ." BFCI submitted a claim to the District seeking payment of about $1.7 million. The District disputed the claimed amount.

On April 9, 2002, BFCI submitted a formal claim to the District pursuant to Government Code section 910 et seq. On May 16, 2002, BFCI assigned its claim against the District to Marshall. Marshall had been the vice-president of BFCI and was now the president of PW, a general contractor.

On July 31, 2002, Marshall, as BFCI's assignee, filed suit against the District.[2]

3. *Pursuant to an emergency resolution, the District awards a contract for completion of the work to Hayward.*

On April 1, 2002, two months after the District terminated its contract with BFCI, the District's Board of Education (Board) adopted an emergency resolution to award a contract for completion of the modernization project at Longfellow Elementary School to Hayward Construction Co. (Hayward).

---

[2] Marshall's suit against the District is not before us.

The resolution included the following recitals: "WHEREAS, the Completion of the Project was scheduled for August 28, 2002 and is falling behind schedule everyday; and, [¶] WHEREAS, the current Codes governing the Letting of Public Contracts requires a process that will add an estimated Sixty (60) to Ninety (90) days to Award a Contract to resume the work and follow through to completion of the Project at Longfellow; and, [¶] WHEREAS, these delays represent a serious impediment to the District's ability to make the necessary transition to appointing another General Contractor in a timely manner in order to attempt to bring the Project back to schedule and deliver the Project on time for the beginning of the 2002–03 School Year; and, [¶] WHEREAS, the inability to utilize the modernized/new classrooms will impact instruction/curriculum, and the unfinished structures, open trenches and materials represent serious safety concerns, and, [¶] NOW, THEREFORE, BE IT RESOLVED, that the Board of Education of [the District] [does] hereby authorize the Award of Contract M-020301/5363Y in the amount of $3,952,804.00 to Hayward Construction Co. for completion of the Phase I Modernization Project at Longfellow . . . on [an] emergency basis without the formal Public Bid and Award process."

The Los Angeles County Superintendent of Schools subsequently approved the emergency resolution awarding the contract to Hayward. (§ 20113, subd. (a).)

4. *Marshall and PW bring a petition for writ of mandate to enjoin the District from making any payments to Hayward and to require the District to advertise publicly for bids to complete the work.*

On June 3, 2002, Marshall and PW filed a petition for writ of mandate (Code Civ. Proc., § 1085), alleging the District's award of the contract to Hayward was unlawful in that no "emergency" existed which would allow the District to avoid compliance with section 20111, subdivision (b),[3] and the District had failed to comply with all procedures necessary to enter into a contract on an emergency basis as set forth in section 22050.[4] Marshall and PW sought to preclude the District from making any payments to Hayward,

---

[3] Section 20111, subdivision (b) provides: "The governing board shall let any contract for a public project . . . involving an expenditure of fifteen thousand dollars ($15,000) or more, to the lowest responsible bidder . . . ."

[4] Section 22050 provides at subdivision (a)(1): "(a)(1) In the case of an emergency, a public agency, pursuant to a four-fifths vote of its governing body, may repair or replace a public facility, take any directly related and immediate action required by that emergency, and procure the necessary equipment, services, and supplies for those purposes, without giving notice for bids to let contracts."

However, section 22050, by its terms, applies only to emergency action taken pursuant to certain enumerated statutes, which statutes do not include section 20113. (§ 22050, subd. (f).) Therefore, section 22050 is not implicated here.

and to require the District to advertise publicly for bids to complete the project and award the contract to the lowest responsible bidder.[5]

### 5. *The District's opposition to the petition.*

In opposition, the District asserted its invocation of the emergency exception was a discretionary legislative act which was subject to deferential review for an abuse of discretion. The District argued it properly invoked the emergency exception to public bidding pursuant to section 20113, and the definition of emergency in section 1102 does not apply to school districts or to section 20113.

The District further contended Marshall and PW were manipulating the court system by filing their petition for the sole purpose of gaining leverage in Marshall's negotiations with the District on the BFCI claim.

In opposition to the petition, the District also submitted a declaration by Edward A. Celaya (Celaya), the District's director of facilities. Celaya asserted the termination of the BFCI contract had resulted in an "instruction/curriculum emergency" as well as a safety emergency because the site contained "unsupervised locations containing construction debris [which] would pose a safety threat to the student population."

Hayward, as the contractor selected by the District to complete the project and a real party in interest, filed an opposition joining in the District's papers.

### 6. *Trial court's ruling.*

On June 21, 2002, the matter came on for hearing. The trial court granted the petition, ruling as follows:

"It is undisputed that the District failed to comply with the competitive bidding and public advertisement requirements set forth in the Public Contract Code. The District's assertion that its termination of the original contact with BF Construction constituted and gave rise to an emergency is unconvincing. The District has failed to present substantial evidence of an 'emergency' as defined by Section 1102 or by any other definition of emergency, such that the exception afforded by Section 20113 would apply.

"Moreover, the District's claim that the construction site creates a danger and inconvenience to students is belied by the fact that it waited almost four

---

[5] With respect to the issue of standing to bring the petition, the petition alleged Marshall was a taxpayer and president of PW, and PW intended to submit a bid if the petition were successful.

months before finding a substitute contractor for the completion of the project. Why didn't the District advertise for public bidding in February or March, after terminating the contract with BF Construction, knowing it takes 60 to 90 days for the public bidding process?

"THEREFORE, IT IS HEREBY ORDERED that the District must publicly advertise for bids to complete the work on the project known as Phase I Modernization at Longfellow Elementary School and Children's Center ('Project'), and to award the contract for said work to the lowest responsible bidder, as required by the Public Contract Code.

"IT IS FURTHER ORDERED that the District shall pay HAYWARD for the work it has performed to date on the Project."

The District filed a premature but timely notice of appeal from the judgment entered August 15, 2002. (Cal. Rules of Court, rule 2(d).)

## CONTENTIONS

The District contends Marshall and PW lacked standing to file their petition and that issue may be raised for the first time on appeal; the trial court had no authority to order the District to award a contract to the lowest responsible bidder; the trial court applied the wrong standard of review in granting the petition because the District's decision to award the contract to Hayward was a legislative decision which cannot be overturned absent an abuse of discretion; the trial court erred in concluding that Hayward was not properly awarded the contract; and lastly, in the event this court affirms the trial court's finding the District exceeded its powers in awarding the contract to Hayward, Hayward must reimburse the District for all payments made to Hayward pursuant to the contract.

Hayward, which was a real party in interest below, filed a joinder in the District's opening brief, joining in all parts of the brief except for the final contention set forth above.

## DISCUSSION

1. *Procedural issues.*

 a. *Appeal not moot; issue affects general public interest.*

In accordance with the trial court's ruling, which invalidated the award of the contract to Hayward and directed the District to advertise publicly for bids to complete the work, the District advertised for bids and awarded the

contract to NBM Construction Corporation. Marshall and PW then filed a motion to dismiss the District's appeal as moot, contending that because the contract for the project had been awarded to a different entity, after public advertisement and competitive bidding, no justiciable controversy remained concerning the contract award to Hayward.

 We denied the motion to dismiss because even if the matter were moot, it presented an issue of public interest concerning the definition of an emergency which allows a school district to dispense with the competitive bidding process. " 'It is now established law that where . . . issues on appeal affect the general public interest . . . , and there is reasonable probability that the same questions will again be litigated and appealed, an appellate court may, although the appeal be subject to dismissal, nevertheless adjudicate the issues involved. [Citations.]' [Citation.]" (*California Ins. Guarantee Assn. v. Liemsakul* (1987) 193 Cal.App.3d 433, 437, fn. 1 [238 Cal.Rptr. 346].)

Further, at least one portion of the appeal is not moot. The District contends that if, as the trial court found, Hayward's emergency contract with the District is invalid, the trial court erred in ruling Hayward is entitled to recover for its work and Hayward must be ordered to disgorge any funds it has received. We conclude Hayward's entitlement to payment must be addressed by this court.

For these reasons, the appeal is not subject to dismissal as moot.[6]

b. *Marshall and PW have standing.*

The District contends Marshall and PW lacked standing necessary to file their petition for writ of mandate in that neither Marshall's status as a taxpayer, nor PW's possibility of bidding on a contract to complete the project, is sufficient to confer standing.

Code of Civil Procedure section 1086 "expresses the controlling statutory requirement for standing for writs of mandate. That statute provides: 'The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of the party beneficially interested.' The requirement a petitioner be 'beneficially interested' has been generally interpreted to mean

---

[6] Marshall and PW elected not to file a respondent brief. Nonetheless, the matter has been fully briefed in that Rene Amy and Schoolhouse Alliance have filed an amicus curiae brief. Rene Amy is a resident and property owner in Pasadena, which is within the jurisdiction of the District, and Schoolhouse Alliance is a charitable organization established for educational purposes. Amici curiae seek affirmance of the trial court's interpretation that the definition of "emergency" in section 1102 applies to section 20113.

one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. [Citations.] The petitioner's interest in the outcome of the proceedings must be substantial, i.e., a writ will not issue to enforce a technical, abstract or moot right. [Citation.] The petitioner also must show his legal rights are injuriously affected by the action being challenged. [Citation.]" (*Braude v. City of Los Angeles* (1990) 226 Cal.App.3d 83, 87 [276 Cal.Rptr. 256], fn. omitted.)

■ As a preliminary matter, although the District did not raise the issue of standing below, it is properly before us. Lack of standing is not waived by failure to raise it in the trial court and may be raised at any point in the proceedings, in that the question of standing to sue goes to the existence of a cause of action against the defendant. (Code Civ. Proc., § 430.80, subd. (a); *Parker v. Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6]; *Killian v. Millard* (1991) 228 Cal.App.3d 1601, 1605 [279 Cal.Rptr. 877].) Nonetheless, the District's attack on petitioners' standing is meritless.

The District's argument that petitioners lacked standing rests on *Steelgard, Inc. v. Jannsen* (1985) 171 Cal.App.3d 79 [217 Cal.Rptr. 152]. That case involved a state agency's procurement of portable classrooms. Steelgard, a manufacturer of portable buildings, was the low bidder on five out of 270 portable facilities. Steelgard filed a petition for writ of mandate (Code Civ. Proc. § 1085), alleging it would have been awarded a substantial portion of the contracts if bids had been solicited under the State Contract Act (§ 10100 et seq.) rather than pursuant to the bidding procedures for the procurement of materials, supplies and equipment (Gov. Code, form. § 14780 et seq.). (*Steelgard, Inc. v. Jannsen, supra,* at pp. 81–82.)

The trial court's denial of the petition was affirmed on appeal. With respect to the issue of Steelgard's standing, the reviewing court found: "Steelgard has additionally failed to show it would benefit in any respect whatsoever if the writ is granted. Steelgard presented no evidence that the intervener or real parties in interest [the successful bidders] would not be able to prequalify under the State Contract Act or that Steelgard would have been the low bidder even if they did not prequalify. *Steelgard has not shown a clear, personal beneficial right to the writ of mandate.*" (*Steelgard, Inc. v. Jannsen, supra,* 171 Cal.App.3d at p. 93, fns. omitted, italics added.)

The *Steelgard* court added: "A citizen who shows no more interest than that of a citizen who wants the law enforced may be granted mandamus '[w]hen the duty is sharp and the public need weighty, . . .' [Citation.] However, this is not such a 'public interest' case. First, Steelgard has not shown 'the duty is sharp and the public need weighty.' Second, in its petition

Steelgard alleges no interest as a citizen interested in enforcing a public right or public duty, but rather asserts an interest based solely on its 'belief' that it would receive more contracts under the State Contract Act, a personal economic interest." (*Steelgard, Inc. v. Jannsen, supra,* 171 Cal.App.3d at p. 93, fn. 8.)

The matter of a citizen's action, discussed in *Steelgard,* "is a long-established exception to the requirement of a personal beneficial interest. The exception applies where the question is one of public right and the object of the action is to enforce a public duty—in which case it is sufficient that the plaintiff be interested as a citizen in having the laws executed and the public duty enforced. [Citation.] [¶] . . . [¶] Judicial recognition of citizen standing is an exception to, rather than repudiation of, the usual requirement of a beneficial interest. The policy underlying the exception may be outweighed by competing considerations of a more urgent nature. [Citations.] [¶] . . . [T]he propriety of a citizen's suit requires a judicial balancing of interests, and the interest of a citizen may be considered sufficient when the public duty is sharp and the public need weighty. [Citation.]" (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1236–1237 [94 Cal.Rptr.2d 740].)

█ Recognition of citizen standing is appropriate in the instant case. Unlike the petition filed by the manufacturer in *Steelgard,* the petition by Marshall and PW was not aimed merely at securing an opportunity for PW to bid on the completion contract. Their petition also sought to protect the public fisc by requiring the District "to publicly advertise for bids to complete the work . . . and to award a contract for said work to the lowest responsible bidder . . . ." Therefore, the District's challenge to petitioners' standing to bring the petition is unavailing.[7]

Having disposed of the threshold procedural issues, we now turn to the merits of the appeal.

---

[7] PW's status as a corporation did not preclude it from joining Marshall in the petition. A corporation, although not generally regarded as a citizen, may in appropriate circumstances be accorded attributes of a citizen litigant. (*Waste Management of Alameda County, Inc., supra,* 79 Cal.App.4th at pp. 1237–1238.)

2. *Trial court properly directed the issuance of a writ of mandate to set aside the award of the contract to Hayward; section 1102's definition of emergency must be read into section 20113 and there was no sudden and unexpected occurrence here.*

 a. *Standard of appellate review.*

A public entity's " 'award of a contract, and all of the acts leading up to the award, are legislative in character.' [Citation.]" (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 [53 Cal.Rptr.2d 355].) Thus, the Board's emergency resolution, awarding the ·contract to Hayward without public bid, amounted to a legislative determination.

Review of "a local entity's legislative determination is through ordinary mandamus under [Code of Civil Procedure] section 1085. 'Such review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support. [Citation.]' . . . 'With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal.' " (*Mike Moore's 24-Hour Towing, supra,* 45 Cal.App.4th at p. 1303.)

██ Further, where the pertinent facts are undisputed and the issue is one of statutory interpretation, the question is one of law and we engage in a de novo review of the trial court's determination. (*Catalina Investments, Inc. v. Jones* (2002) 98 Cal.App.4th 1, 6 [119 Cal.Rptr.2d 256].)

 b. *The pertinent statutes.*

Section 20113 was the basis for the District's emergency resolution. Section 20113 is located in an article of the Public Contract Code relating to school districts and provides: "(a) *In an emergency* when any repairs, alterations, work, or improvement is necessary to any facility of public schools to permit the continuance of existing school classes, or to avoid danger to life or property, the board may, by unanimous vote, with the approval of the county superintendent of schools, do either of the following: [¶] (1) Make a contract in writing or otherwise on behalf of the district for the performance of labor and furnishing of materials or supplies for the purpose without advertising for or inviting bids. [¶] (2) Notwithstanding Section 20114, authorize the use of day labor or force account for the purpose." (Italics added.)

The term "emergency" is defined in section 1102, which states: " '*Emergency,*' *as used in this code*, means a sudden, unexpected occurrence that

poses a clear and imminent danger, requiring immediate action to prevent or mitigate the loss or impairment of life, health, property, or essential public services." (Italics added.)

The essential question presented is whether section 1102's definition of emergency, namely, "a sudden, unexpected occurrence" posing a clear and imminent danger requiring prompt action to protect life, health, property or essential public services, must be read into section 20113.

### c. *The District's arguments.*

The District contends section 1102 is inapplicable to the instant emergency resolution for three reasons: on its face section 20113 contains its own definition of emergency which prevails over the inconsistent definition contained in section 1102; historically, no cataclysmic event was required for a school district to award a contract on an emergency basis; and the legislative history relating to the enactment of section 1102 clearly states that section 1102 does not apply to school districts. For the reasons discussed below, these arguments are unavailing.

### d. *Principles of statutory interpretation.*

"In statutory construction cases, our fundamental task is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.] 'We begin by examining the statutory language, giving the words their usual and ordinary meaning.' [Citations.] If the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If there is ambiguity, however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such cases, we ' " 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' [Citation.]" (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911 [108 Cal.Rptr.2d 165, 24 P.3d 1191].)

### e. *There is no ambiguity: section 1102 defines emergency for purposes of the Public Contract Code.*

At the time section 1102 was enacted in 1994, section 20113 already was on the books and stated: "*In an emergency* when any repairs, alterations, work, or improvement is necessary to permit the continuance of existing school classes, or to avoid danger to life or property, the board may, by unanimous vote, with the approval of the county superintendent of schools,

do either of the following: [¶] (a) Make a contract in writing or otherwise on behalf of the district for the performance of labor and furnishing of materials or supplies for the purpose without advertising for or inviting bids. [¶] (b) Notwithstanding Section 20114, authorize the use of day labor or force account for the purpose." (Stats. 1985, ch. 828, § 1, pp. 2650–2651, italics added.)[8]

Thus, section 20113 conferred certain powers upon a school district in the event of an emergency, and provided procedures for exercising those powers, but did not itself provide a definition of "emergency."

■ Against this backdrop, in 1994 the Legislature adopted section 1102, which as noted provides: " *'Emergency,' as used in this code*, means a sudden, unexpected occurrence that poses a clear and imminent danger, requiring immediate action to prevent or mitigate the loss or impairment of life, health, property, or essential public services." (§ 1102, italics added; Stats. 1994, ch. 803, § 1, p. 3944.) There is nothing ambiguous about the phrase "as used in this code." In enacting section 1102, the Legislature did not merely define the term "emergency" for a particular chapter, article or division of the Public Contract Code—rather, it defined the term "emergency" for the entire Public Contract Code. It logically follows the definition of section 1102 must be read into section 20113.

With respect to the need for section 1102, the legislative history of Assembly Bill No. 3348 states: "Emergency contracting provisions include different requirements if notice for bids to let contracts will not be given. These include different vote requirements and different definitions of 'emergency.' [¶] Different emergency contracting provisions can cause confusion for the public that follows the actions of government bodies and pays for the improvements. These differing provisions also cause confusion for contractors who want to bid on the projects. [¶] 2) This bill includes a common procedure for contracting under these circumstances, and the Senate amendments clarify these procedures, *revise the types of entities subject to these provisions, and add a common definition of 'emergency' in the Public Contract Code.*" (Concurrence in Senate Amendments, Bill Analysis, Assem. Bill No. 3348 (1993–1994 Reg. Sess.) as amended Aug. 29, 1994, italics added.)

Thus, at the end of the day, in section 1102 the Legislature adopted a far-reaching definition of "emergency." If the Legislature wanted to exempt school districts, or section 20113, from section 1102's definition of emergency, it certainly was capable of doing so.

---

[8] In 1995, section 20113 was amended to its current form, in respects not relevant here. (Stats. 1995, ch. 897, § 2, p. 6874.)

By way of comparison, section 22050, which also was added by Assembly Bill No. 3348, states: "This section applies only to emergency action taken pursuant to Sections 20133 . . . ." (§ 22050, subd. (f); Stats. 1994, ch. 803, § 88, p. 3998.) Section 1102 contains no such limitation. Therefore, its far reaching definition of emergency must be read into section 20113.

In an attempt to avoid the broad application of section 1102, the District cites an interim portion of the legislative history of Assembly Bill No. 3348 which states: "Who's excluded? AB 3348 covers the emergency contracting procedures of almost all local agencies, but doesn't include school districts . . . ." (Sen. Local Gov. Com., analysis, Assem. Bill No. 3348 (1993–1994 Reg. Sess.) as amended July 1, 1994, p. 2.) The District's reliance thereon is misplaced. It is the Legislature's sweeping intent as manifested in section 1102 which must be given effect because " '[i]t is the language of the statute itself that has successfully braved the legislative gauntlet.' " (*People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].) We decline to rewrite section 1102 to insert an exception for school districts, an exception which the Legislature ultimately chose not to include.[9]

In sum, section 1102's definition of "emergency" must be read into section 20113.[10]

■ Further, given the strong public policy favoring competitive bidding, the emergency exception thereto should be strictly construed and restricted to circumstances which truly satisfy the statutory criteria. We make the additional observation that an interpretation of section 1102 which upholds the broadest possible application of the statute is consistent with the strong public policy favoring competitive bidding. Without casting any aspersions on the award of the contract to Hayward, we note the " 'purpose of requiring governmental entities to open the contracts process to public bidding is to eliminate favoritism, fraud and corruption; avoid misuse of public funds; and stimulate advantageous market place competition.' " (*MCM Construction*

[9] The District also contends the breadth of section 1102 is inadvertent and the Legislature never intended section 1102 to serve as a limitation on section 20113 or on school districts. Given the sweeping and unambiguous language of section 1102, defining "emergency" for the entire Public Contract Code, we reject the argument that section 1102 resulted from a drafting error.

[10] If our interpretation of sections 1102 and 20113 is not what the Legislature intended, the statutory scheme could use clarification. (See *International Longshoremen's & Warehousemen's Union v. Los Angeles Export Terminal, Inc.* (1999) 69 Cal.App.4th 287, 304, fn. 6 [81 Cal.Rptr.2d 456].)

*Inc. v. City and County of San Francisco* (1998) 66 Cal.App.4th 359, 369 [78 Cal.Rptr.2d 44].)[11],[12]

> f. *Our narrow interpretation of the instant emergency exception is consistent with emergency provisions in other contexts.*

Assembly Bill No. 3348's legislative history indicates that section 1102's definition of emergency was imported from the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

The CEQA definition provides: "*'Emergency' means a sudden, unexpected occurrence, involving a clear and imminent danger, demanding immediate action to prevent or mitigate loss of, or damage to, life, health, property, or essential public services.* 'Emergency' includes such occurrences as fire, flood, earthquake, or other soil or geologic movements, as well as such occurrences as riot, accident, or sabotage." (Pub. Resources Code, § 21060.3, italics added.)

The legislative history underlying Assembly Bill No. 3348 states: "The definition of 'emergency' in this bill is similar to the definition in [CEQA], and for that reason should be well known to local agencies that must file a notice of exemption under CEQA for making emergency improvements." (Assem. Com. on Local Gov., Analysis of Assem. Bill No. 3348 (1993–1994 Reg. Sess.) Apr. 13, 1994, p. 2.)

Looking to CEQA for guidance, the "exception for action under CEQA for emergencies '. . . is . . . *extremely narrow.*' [Citation.] '. . . [T]he definition limits an emergency to an "occurrence," not a condition, and . . . the occurrence must involve a "clear and imminent danger, demanding immediate action." ' [Citation.]" (*Los Osos Valley Associates v. City of San Luis Obispo* (1994) 30 Cal.App.4th 1670, 1682 [36 Cal.Rptr.2d 758], italics added, original italics omitted.)

*Los Osos* noted that "[a]lthough courts generally defer to legislative determinations, '. . . the mere declaration of the [City] council . . . that the

---

[11] Amici curiae have submitted exhibits indicating that emergency resolutions have been adopted by various districts for numerous projects, including the purchase of seven dimmers for a performing arts center at a community college ($150,000), construction of a library parking lot ($127,500), installation of a water storage and booster pump at a high school snack bar ($33,590), and installation of a lighting control panel and operational system for the tennis court at a high school ($38,000).

We do not comment on any of those emergency resolutions, other than to note that section 1102 defines "emergency" for purposes of the Public Contract Code.

[12] Now more than ever, with the voters having entrusted school officials with billions of dollars in education bonds, against the backdrop of a towering state deficit, it is crucial that school districts avail themselves of the benefits of public bidding.

ordinance is passed for the immediate preservation of the public health is neither conclusive nor yet sufficient.' [Citations.]" (*Los Osos Valley Associates, supra,* 30 Cal.App.4th at p. 1682.) In *Los Osos*, during a drought a city supplied its residents with water it drew from the ground. The groundwater pumping caused subsidence resulting in damage to buildings. (*Id.*, at p. 1674.) The trial court "found that no emergency existed; it found that the City made a political choice over time." (*Ibid.*) The appellate court agreed with that determination. (*Ibid.*)

*Los Osos* further explained: "The term 'emergency' '. . . has long been accepted in California as an unforeseen situation calling for immediate action. [Citations.]' [Citation.] 'Not only must urgency be present, the magnitude of the exigency must factor.' [Citation.] 'Emergency is not synonymous with expediency, convenience, or best interests [citations], and it imports "more . . . than merely a general public need." [Citation.] Emergency comprehends a situation of "grave character and serious moment." [Citation.]' [Citation.] It is 'evidenced by an imminent and substantial threat to public health or safety. [Citations.]' (. . . see generally, *Rutherford v. State of California* (1987) 188 Cal.App.3d 1267, 1280 [233 Cal.Rptr. 781] [no emergency where rainfall which caused problem fell over a year before construction work at issue commenced].)" (*Los Osos Valley Associates, supra,* 30 Cal.App.4th at p. 1681.)

> g. *The District's termination of the BFCI contract did not constitute an emergency within the meaning of section 1102.*

 Having determined that section 1102's definition of emergency must be read into section 20113, and that the emergency exception is to be read narrowly, we turn to the circumstances of the instant case. This fact situation did not come close to meeting the standard set by section 1102. The purported emergency stemmed from the District's decision to terminate its contract with BFCI for the District's own "convenience." That event was not a "sudden, unexpected occurrence" posing a clear and imminent danger requiring prompt action to protect life, health, property, or essential public services. (§ 1102.) Therefore, the trial court properly directed the issuance of a writ of mandate to set aside the District's award of the contract to Hayward on an emergency basis.

> 3. *The District's challenge to the trial court's ruling requiring it to award the contract to the lowest responsible bidder is moot.*

The District contends that upon setting aside the contract to Hayward, the trial court had no authority to order it to award the contract to the lowest responsible bidder. The District asserts there are numerous methods by which

it can procure goods and services and awarding a contract through competitive bidding is only one alternative.

To illustrate its point, the District cites a variety of procurement methods, including, inter alia, contracts for professional services (§ 20111, subd. (c)), or work "by day labor, or by force account." (§ 20114, subd. (a).)[13] Therefore, the District seeks reversal of that portion of the trial court's order requiring it to publicly bid any construction work necessary at Longfellow, to enable the District to use any method of procurement available to it under law.

This aspect of the appeal is moot. As indicated, after the trial court granted the petition for writ of mandate and set aside the award of the contract to Hayward, the District publicly advertised for bids and awarded the contract to NBM Construction Corporation. Because the District already has awarded a contract to NBM after public advertisement and competitive bidding, no justiciable controversy exists concerning the trial court's order requiring the District to publicly bid the contract. Any opinion by this court with respect to said issue would be purely advisory and therefore this point merits no discussion.

### 4. *Trial court properly ordered the District to pay Hayward for work performed on the project.*

Finally, the District contends the trial court erred in requiring it to pay Hayward for the work done on the project. The District asserts that if, as the trial court held, the award of the contract to Hayward was illegal, Hayward is barred from recovering for the work.

In support, the District cites *Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228 [115 Cal.Rptr.2d 900, 38 P.3d 1120], stating: "In general, under long-standing California law, if a public contract is declared void, a contractor may not be paid for work performed under that contract. (*Miller v. McKinnon* (1942) 20 Cal.2d 83, 89 [124 P.2d 34] . . . .)" (*Amelco Electric, supra,* at p. 234.) The cited case, *Miller v. McKinnon,* explained: "Ordinarily, compliance with the terms of a statute requiring the letting of certain contracts by a public agency such as a municipal corporation or county by competitive bidding and the advertising for bids is mandatory with respect to those contracts coming within the terms of the statute; a contract made without compliance with the statute is void and unenforceable as being in excess of the agency's power." (*Miller, supra,* 20 Cal.2d at pp. 87–88.)

---

[13] Other than listing a variety of procurement methods, the District does not indicate which, if any, would be applicable here.

However, the rule cited by the District has been superseded by section 5110, which entitles a contractor who proceeded with construction "based upon a good faith belief that the contract was valid" (§ 5110, subd. (a)(1)) to recover the reasonable cost of the work performed, irrespective of a later determination that the contract is "invalid due to a defect or defects in the competitive bidding process caused solely by the public entity . . . ." (§ 5110, subd. (a).)[14]

■ Here, Hayward was in no position to know the award of the contract to it was in contravention of the Public Contract Code. The contract was awarded to Hayward pursuant to an emergency resolution adopted by the District's Board of Education and subscribed by six of the seven Board members, including the Board's president. The resolution expressly authorized the award of the contract to Hayward on an emergency basis without public bidding. Thereafter, the emergency resolution was duly approved by the Los Angeles County Superintendent of Schools. Hayward was entitled to rely on these official acts when it undertook the work. Merely because it was later determined in judicial proceedings the predicate emergency was absent does not absolve the District of paying Hayward for the work it performed.

## DISPOSITION

The judgment is affirmed. The parties shall bear their respective costs on appeal.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied July 28, 2004, and the opinion was modified to read as printed above.

---

[14] In adopting section 5110, the Legislature declared its intent that a contractor "may be paid the reasonable cost, specifically excluding profit, of labor, equipment, materials, and services that were rendered under a contract that was competitively bid, but subsequently determined to be invalid, in order to avoid unjust enrichment of the public entity and an unlawful taking of the contractor's property." (Stats. 2003, ch. 678, § 1.)