Filed 6/17/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MICHAEL WEINSTEIN et al., | B250857 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS138053) |
| v. | |
| COUNTY of LOS ANGELES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joanne B. O'Donnell, Judge. Reversed with directions.

Ford, Walker, Haggerty & Behar, Renee E. Jensen; Greines, Martin, Stein & Richland, Timothy T. Coates and Barbara W. Ravitz for Defendants and Appellants.

Strumwasser & Woocher, Gregory G. Luke, Beverly Grossman Palmer; AIDS Healthcare Foundation, Thomas Meyers and Samantha Azulay for Plaintiffs and Respondents.

_____

In February 2012, the County of Los Angeles (County) approved a no-bid contract with Ramsell Public Health Rx, LLC (Ramsell) for pharmacy administrator services to assist the County in implementing provisions of the Affordable Care Act (ACA). After AIDS Health Foundation (AHF) challenged the award of the contract, the trial court invalidated the contract in June 2012. Days later, the County approved another no-bid contract with Ramsell substantially identical to the first contract, but which had a one-year term. AHF challenged the second contract.

The trial court found that an exception in the County Code permitting no-bid contracts where the contract was for personal services of an "extraordinary and technical nature" and where the services were temporary did not apply because the County had not demonstrated any specialized skills were required to administer the pharmacy benefits under the contract; rather, rudimentary computer and organizational skills were sufficient.

On appeal, the County argues that the trial court failed to accord sufficient deference to the County's conclusion that the exception applied; the contract was exempt from competitive bidding because it was a personal services contract that (1) could not be performed by County employees in the time available; (2) involved services of an extraordinary professional or technical nature, and (3) remedied an emergency situation that required quick action. Finally, the County asserts that voiding the Ramsell contract on the very last day of its term made a mockery of the equitable nature of the mandate remedy. We agree with the County that the trial court failed to accord sufficient deference to the County's evaluation of its needs for the services of a pharmacy administrator who could provide the necessary data management and provision of pharmaceuticals to address its needs in implementing provisions of the ACA, and reverse with directions that the trial court enter judgment in the County's favor.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

1.     *The Parties*

AHF is a California nonprofit corporation and participant in the state's Medi-Cal program. AHF provides medicine and advocacy to persons with HIV/AIDS regardless of ability to pay. AHF operates eleven healthcare centers and pharmacies throughout California

2

primarily serving low-income patients. AHF operates Positive Healthcare, a primary care case management program for Medi-Cal patients with AIDS under a contract with the Los Angeles County Department of Health Services (DHS). AHF is qualified to provide the same pharmacy network administrative services as contemplated on the Ramsell contracts. Michael Weinstein (Weinstein) is the president of AHF.

Ramsell is a California limited liability company located in Oakland, California. Ramsell is an administrator that provides and manages 340B pharmacy programs,[1] provides pharmacy claims processing and adjudication, negotiates and manages contracts between itself and its network pharmacies, provides 340B administrative services and provides for other related pharmacy benefit administrative services.

The DHS is the County agency responsible for providing certain health services to residents in Los Angeles County and operates hospitals throughout the County.

2.      *Governing Legal Principles.*

Los Angeles County Code chapter 2.121, "Contracting With Private Businesses," provides that it applies to contracts "with private businesses to perform personal services which are currently performed by county employees, or which could be performed by county employees through the recruitment of additional personnel." (L.A. County Code, § 2.121.250, subd. (A).) Competitive bidding is designed to "invit[e] competition, to guard against favoritism, improvidence, extravagance, fraud, and corruption, and to secure the best work or supplies at the lowest price practicable." (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 173.)

As a rule, such contracts are awarded by competitive sealed bidding "unless it is determined in writing by the department recommending the award of a contract that this method is not practicable." (L.A. County Code, § 2.121.320, subd. (A).) If the use of

---

[1] The federal drug reimbursement program is known as the "340B program," a reference to the section of the Public Health Service Act that allows designated entities to purchase certain drugs at substantially reduced prices negotiated by the federal government. (42 U.S.C. § 256b.)

3

competitive sealed bidding is not practicable, "a contract may be awarded by competitive negotiation." (L.A. County Code, § 2.121.330, subd. (A).) "A contract may be made by noncompetitive negotiation only when competition is not feasible, as determined in writing prior to award by the department recommending award of the contract." (L.A. County Code, § 2.121.350.)

There are two notable exceptions to the competitive bidding requirements of Los Angeles County Code section 2.121. Relevant here, Los Angeles County Code section 2.121 does not apply in the first instance where, among other things, (1) "[t]he service cannot be performed adequately or competently or satisfactorily by civil service employees and it is impossible to recruit such personnel to perform such service for the period of time such service is needed by the county"; or (2) "[t]he service is of an extraordinary professional or technical nature and the services are of a temporary nature." (L.A. County Code, § 2.121.250, subds. (B)(2), (B)(3).)

*3. The Affordable Care Act and Transition of Patients from Ryan White to Low Income Health Plan Based Drug Programs v*

On March 23, 2010, the federal government passed the Affordable Care Act (42 U.S.C. § 300gg et seq.) (ACA) that anticipated the extension of Medicaid coverage in 2014 to over one million previously uninsured California citizens. Under the ACA, beneficiaries needed to be transferred from the Ryan White CARE Act (42 U.S.C. § 300gg-12 et seq.) (Ryan White), which had provided pharmaceuticals, to the Low Income Health Plan (LIHP). The County's LIHP is known as "Healthy Way LA." Healthy Way LA provided for the creation of a pharmacy network to expand pharmacy access to patients with HIV/AIDS and to streamline billing and federal reimbursement for healthcare providers who became part of the network.

In November 2010, in anticipation of the changes made by the ACA, the California Department of Health Services implemented a new state Medicaid program known as the

4

"Bridge to Reform."  The Bridge to Reform employed a new Medicaid section 1115 Waiver[2] to help the state meet the challenges of enrolling the significant number of patients who were newly eligible under the ACA.  In particular, the Bridge to Reform provided for the creation of pharmacy networks that would expand pharmacy access to HIV/AIDS patients.  At the time, over 15,000 persons received benefits under Ryan White, while an additional 5,000 persons would be eligible for benefits under the LIHP program.  The Bridge to Reform was expected to end on December 31, 2013.

On July 22, 2011, the federal government notified California that the transition of such patients would begin October 1, 2011 (later extended to July 1, 2012).

(A)    **RAMSELL I**

In January 2012, DHS submitted a transition plan report to the County Board of Supervisors in which it notified the Board that it was negotiating an agreement with a pharmacy administrator to provide pharmacy network services to HIV/AIDS patients in accordance with the Bridge to Reform.

On February 7, 2012, DHS recommended to the Board that it approve a sole-source, $75 million 340B contract for pharmacy administrator services with Ramsell to administer the pharmacy network.  The DHS also recommended that the County award the contract without engaging in a competitive bidding process.  DHS asserted that it did not have time for a standard RFP (request for proposals) process and that it was only aware of two entities offering the necessary pharmacy administrative services, and of the two, one's business model was not compatible with DHS.

On March 15, 2012, the County entered into the Ramsell I contract, which had a three-year term, with automatic renewal for successive one-year terms.  (Ramsell I.)

---

[2] "Waivers" are federally approved methods of testing new or existing ways to deliver and pay for health care under Medicaid, and allow states to apply for flexibility in such testing.

After AHF challenged the Ramsell I contract on the grounds it violated Los Angeles County Code section 2.121, on June 6, 2012, the Los Angeles County Superior Court agreed and granted plaintiffs' application for writ of mandate voiding the Ramsell I Contract.

### (B) RAMSELL II[3]

On June 15, 2012, the County published a notice under the Brown Act that it would ask the Board at its regularly scheduled June 19, 2012 meeting to authorize the award and execution of another $75 million no-bid contract to Ramsell to provide the same services specified in the Ramsell I contract. The Ramsell II contact was identical to the first Ramsell contract except for its duration. The Ramsell II contract would run on a month-to-month basis for up to 12 months. The County argued that because the Ramsell II contract was temporary, it qualified for an exception to competitive bidding requirements of Los Angeles County Code section 2.121.250, subdivision (B)(3).

The Ramsell II contract's salient provisions set forth that Ramsell is an administrator and provides and manages 340B pharmacy programs, provides pharmacy claims processing and adjudication, negotiates and manages contracts between itself and its network pharmacies, provides 340B administrative services, and provides for other pharmacy benefits administration services. Further, the services to be provided under the Ramsell II contract included, among other things: claims processing; plan design, review and management; real-

---

[3] After AHF initiated a separate proceeding to challenge the Ramsell II contract, proceedings in *Ramsell I* continued in the trial court, with the County filing a return to the *Ramsell I* writ in October 2012, stating that the Ramsell II contract complied with the writ issued in Ramsell I. AHF objected, stating that the County had failed to adequately demonstrate compliance with the writ. On November 9, 2012, the trial court, Ann I. Jones, Judge, found in *Ramsell I* that there was insufficient evidence that the Ramsell II contract was in violation of Proposition A. Judge Jones further found the proposed pharmaceutical services were of an "'extraordinary professional'" nature within the meaning of Los Angeles County Code section 2.121.250, subdivision (B)(3). This order discharged the writ in *Ramsell I* and concluded the writ proceedings, although *Ramsell I* was later consolidated with *Ramsell II,* and AHF's challenge to the Ramsell II contract continued. Thus, there was never a final judgment in the *Ramsell I* proceedings, and due to the consolidation of the two matters, *Ramsell I* is subsumed within the current appeal.

time review of drug utilization; reports of claims data; ongoing maintenance and reporting of virtual inventory of 340B covered drugs at contract pharmacies; payment of 340B drug acquisition costs and negotiated dispensing fees; ordering drugs; managing each individual pharmacy's inventory and generating replenishment orders; and providing electronic patient and inventory recordkeeping.

The Ramsell II contract provided Ramsell would make available the use of Ramsell's proprietary software application by which the pharmacy could track inventory and purchases. At the end of the term of the contract, Ramsell would assist the County in transitioning all data collected to the County.

DHS sent a recommendation to the Board that the Board approve Ramsell II, and that the contract was exempt from the competitive solicitation requirements of Los Angeles County Code section 2.121.250, subdivision (B)(3) because the contract was temporary and for a professional or technical service. The Ramsell II contract had a term of up to 12 months, at an estimated cost not to exceed $5.9 million per month for pharmaceutical ingredient costs, and $300,000 per month for transaction costs, and other fees, for a total not to exceed $75 million for one year.

DHS's recommendation asserted that as many as 5,000 persons would be affected by the transition to LIHP. The mandatory transition would begin July 1, 2012 when the state would require LIHP eligibility screening as part of the Ryan White enrollment/reenrollment process. Further, the California Department of Health Care (CDHC) intended to change its computer system in June 2012 in preparation for this patient transaction; as a result, commencing on July 1, 2012, Ryan White patients seeking recertification/renewal of their benefits would automatically be screened for LIHP eligibility. Patients in Los Angeles County's LIHP (Healthy Way LA), would need to access medication through Healthy Way LA networks because they would no longer have access to medications through Ryan White.

DHS pointed out that "[d]uring the transition, this temporary 340B Contract Pharmacy Administrator Services Agreement with Ramsell is critical to maintaining the health of HIV patients in Los Angeles County, and ensuring compliance with Federal 340B regulations.

7

Timely, uninterrupted access to medications is essential for HIV patients, and lack of access could result in devastating health consequences for this vulnerable population. [¶] This temporary agreement is Los Angeles County's best mechanism to ensure pharmacy access for HIV patients because it provides a broad pharmacy network to patients seen in [Healthy Way LA] clinics, enabling compliance with Federal 340B regulations. . . . Without these 340B pharmacy administrator services provided by Ramsell, [Ryan White] patients transitioning to [Healthy Way LA] would be limited to accessing clinic onsite pharmacies, given current federal regulations. [Healthy Way LA] clinics without onsite pharmacies would have significant difficulty in providing 340B-compliant pharmacy access, given the complicated federal requirements in place for use of 340B contract pharmacies. In this vulnerable population, which often experiences challenges in areas such as transportation and childcare, long pharmacy commutes and waiting times would likely result in delayed or missed medications and serious health consequences." Under the proposed Ramsell II contract, many patients would not need to change pharmacies.

In its proposal for Ramsell II, DHS also explained the genesis of Ramsell I and the urgent need for Ramsell's services. In October 2011, DHS advised the board it was working with the County Counsel to negotiate an agreement with a 340B contract pharmacy administrator. DHS intended to transition Ryan White patients by November 1, 2012, and "[t]hus, County DHS did not have time to complete a competitive selection process, which typically takes one year or more to complete." DHS explained that Ramsell II would provide a temporary month-to-month agreement to permit DHS to provide essential pharmacy services for up to a year while it undertook a competitive solicitation process.

DHS explained that Ramsell would receive administrative fees, not to exceed $60,000 per month, under the terms of Ramsell II. "It should be noted that the majority of costs under this agreement are not related to Ramsell's administrative fees but to the actual 340B costs of the pharmaceuticals themselves and the expense of participating network pharmacies to provide these drugs, which includes pharmacy dispensing fees and mail order/delivery costs. Ramsell is not a provider of pharmaceuticals, but is simply the fiscal intermediary that will

8

arrange for the [Health Way LA] clinic to provide access to 340B-priced drugs through contracted pharmacies across a vast array of pharmacy sites, including but not limited to onsite clinic pharmacies, community retail pharmacies, and chain drug store pharmacies, all in an effort to promote continuity and patient access. Thus, while it will pass through funds for the County, it is entitled to reimbursement only for its administrative costs, up to $60,000 per month." The expected monthly pharmaceutical cost would be $5.9 million.

DHS asserted that the Ramsell II agreement was for "a temporary and professional or technical service and, as such, is exempt from Proposition A, including [Proposition A's] competitive selection requirements." DHS or Ramsell could terminate the agreement without cause on 30 days' notice to the other party; such termination provision would accommodate DHS's implementation of Ramsell's successor. The Ramsell II agreement further contained a provision on future solicitation under which Ramsell acknowledged that the County could enter into an agreement with another entity for provision of the services contemplated in Ramsell II.

4.      *The Plaintiff's Petition for Writ of Mandate: Ramsell II*

On June 18, 2012, plaintiffs filed a petition for writ of mandate seeking to enjoin the County from entering into the Ramsell II contract; declaring the Ramsell II contract to be invalid, void, and unenforceable; prohibiting the County from entering into a no-bid contract unless and until the County justified its use of competitive negotiation or non-competitive negotiation; and costs and attorney fees. AHF sought a temporary restraining order to stop consummation of the Ramsell II contract.[4]

**(A)      AHF'S ARGUMENTS**

AHF asserted that the ACA deadline of July 1, 2012 was not a hard deadline but merely a goal, and failing to meet the deadline would not cost any additional County funds.

---

[4] On June 19, 2012, the trial court denied the application for a temporary restraining order on the basis the Ramsell II contract was short-term because it was for month-to-month services, and the County may enter into a temporary contract for professional or technical services. On November 7, 2012, the court set a briefing schedule and a hearing on the merits for May 5, 2013.

9

Further, AHF was actively in the business of HIV/AIDS pharmaceutical administration and understood the services that Ramsell would be providing. Although AHF used a paper-based system, AHF was a 340B qualified covered entity, and could order wholesale pharmaceuticals, distribute them to pharmacies, and electronically track and seek reimbursement for drugs under 340B's reduced pricing system on behalf of partner pharmacies servicing 340B eligible HIV/AIDS patients. AHF already provided analogous services to a portion of the same patient population to be served by Ramsell. The skills required to perform these tasks could be performed by high school graduates, and AHF's personnel performing such tasks had computer skills and organizational skills, but did not have any specialized professional skills. Further, the Ramsell contract did not require the vendor to deploy hardware or programs that could be used only by persons with specialized training, but required services that could be performed by persons with basic database management skills. The only arguably specialized skill was familiarity with the basic lexicon of pharmacy administration.

Donna Stidham, the Chief of Managed Care at AHF, asserted that she oversaw AHF's pharmacy benefit management contracts with different pharmacy benefit management companies. Such contracts require five primary tasks: (1) maintaining a database of eligible patients, (2) maintaining information regarding drugs covered by the plan, (3) coordination with local pharmacies and the County to determine whether a claim qualifies for coverage, (4) inventory management, and (5) reporting to the County. These tasks do not require any specialized degree or training and only require computer and organizational skills. Her review of the Ramsell II contract indicated it required the same five skills. More specifically, as set forth in Stidham's declaration:

1. Regarding maintaining a database, this task would not require the pharmacy benefit manager to screen patients for eligibility because the list would be received from the County. Patients would be added on a rolling basis based on the patient's birth month, so the database would grow at a measured pace of about 417 patients per month. (Ramsell II Contract, section 2.12.)

10

2. Regarding maintaining a formulary, this task is ministerial, requiring only that the pharmacy benefit manager implement decisions already made by the County concerning covered drugs. The task only requires the comparison of drugs on the approved list and requires no specialized pharmacy knowledge, and the pharmacy's file of 340B drugs would be maintained and any price changes updated. (Ramsell II Contract, section 2.2.)

3. Regarding claims processing, this task involves coordination with the patients' local pharmacies and requires the pharmacy benefit manager to verify that the patient is enrolled in LIHP and eligible, that the requested medication is in the formulary, the patient is authorized to receive the drug in question, and whether any refill is permitted, and the requested medication does not exceed quantity limits or other contraindications. This task does not require any specialized skill other than maintaining the database concerning enrolled patient information. The pharmacy benefit manager must coordinate with the local pharmacy through the internet. All rules for claims processing have been set by the County and the medical profession, and no discretionary decisions are required. (Ramsell II Contract, section 2.2.)

4. Regarding inventory management, this task involves managing inventory at contract pharmacies. The pharmacy benefit manager must make replacement orders to replenish the pharmacies. Orders must be submitted to drug wholesalers under the 340B program. The manager must transmit information between pharmacies and wholesalers, track inventories utilizing software for this purpose. The pharmacy benefit management makes the initial payment and invoices the County for costs. These tasks do not require specialized training or education. (Ramsell II Contract, sections 2.2, 2.8, 2.9.)

5. Regarding reporting, this task requires the pharmacy benefit manager to report on a monthly basis with data on drugs being dispensed. The pharmacy benefit manager must also prepare a report using a standard report format established by the County as defined in the Ramsell II contract. No discretion is required in the preparation of these reports. This task requires the pharmacy benefit manager to provide the County and other participating entities with a software system to track claims and maintain purchase order data. According to Stidham, "[t]his type of inventory software is commercially available and could be purchased

11

by any [pharmacy benefit manager] from an appropriate vendor and easily adapted to fit the purposes addressed in the Ramsell II contract." The participating pharmacies referenced in the Ramsell II contract are already 340B qualified, which "means that the pharmacies themselves maintain the federal qualifications to receive the drugs that are part of the 340B purchasing program at reduced rates," and accordingly, the pharmacy benefit management does not need to be 340B qualified; as a result, this task involves marketing but does not involve extraordinary technical training. (Ramsell II contract, sections 2.3 and 2.11.)

"In sum, a [pharmacy benefit manager] acts as a data aggregator . . . [and] ease[s] the administrative burden on the entity with whom they contract by maintaining the patient and drug lists and sending out the invoices and drug-restocking orders. . . . An individual pharmacy is typically connected to multiple [pharmacy benefit management] software systems in order to carry out their day-to-day business and serve [their] customers." "AHF is a section 340B-qualified entity [and] serves as an LIHP pharmacy under its extant contract with the County . . . . [AHF] fills prescriptions [for] HIV/AIDS patients participating in LIHP and bills the County directly for drugs dispensed to LIHP patients. AHF maintains its own ordering and inventory of 340B drugs with its wholesaler."

According to Scott Carruthers, the National Director of pharmacy at AHF, AHF, a section 340B covered entity, can order, obtain from a wholesaler, distribute, electronically track, and seek reimbursement for drugs under 340B. AHF already provides this service to AHF pharmacies. The pharmacy administrative services of the Ramsell II contract primarily require the provision and maintenance of an IT infrastructure and related databases. The Ramsell II contract does not require a vendor to deploy computer hardware.

**(B)    THE COUNTY'S ARGUMENTS**

In opposition, the County primarily argued that Los Angeles County Code section 2.121.250, subdivision (B)(3) exempted the Ramsell II contract from competitive bidding because DHS did not have the infrastructure to provide pharmacy administrative services, the service provided was of an extraordinary or technical nature, and AHF's description of the services provided did not adequately delineate their scope. The County also argued under Los

12

Angeles County Code section 2.121.250, subdivision (B)(2) that DHS did not have the infrastructure to provide pharmacy administration services because it did not have the IT "to comply with the federal regulatory requirements for contract pharmacy administration" and "to electronically adjudicate the pharmacy claims to be submitted . . . for pharmacy reimbursement."

DHS asserted that "[g]iven the anticipated short timeline for the Ryan White to [Healthy Way LA] transition, DHS had to identify a vendor that possessed the necessary infrastructure and experience in handling a 340B contract pharmacy network amongst multiple 340B covered entities and a variety of different retail pharmacies in an immediate manner. For DHS, a solicitation typically requires one year to issue and complete. Accordingly, there was insufficient time to issue a solicitation for this temporary service." DHS sought to identify a vendor with experience in managing 340B contract pharmacy networks for separately owned, federal Health Resources Safety Administration (HRSA) covered entities. DHS identified a vendor, but after negotiations fell through, DHS identified Ramsell as a potential vendor. DHS asserted that there was no evidence "AHF had the necessary software or systems set up to handle the 340B compliance when the clinic and the pharmacy are not owned by the same entity, which would be the case for many of the [Healthy Way LA] HIV clinic sites."

For the County, Amy Gutierrez, Director of Pharmacy Affairs, stated that DHS oversees the Healthy Way LA program. Because "DHS-owned and operated clinics do not have sufficient capacity to provide access to all eligible county patients, DHS contracts with over 160 community clinics to provide offsite care for approximately 61,000 [Healthy Way LA] patients. Initially, the Healthy Way LA program managed clinic and associated pharmaceutical reimbursement claims for community provider patients through a retroactive reimbursement, paper-based claims process though a vendor."

DHS held meetings in September and October 2011 concerning the transition of the Ryan White patients to Healthy Way LA with the County's HIV Community Partners clinics (the County's Healthy Way LA contractors). At the meetings, multiple clinics expressed

13

concerns over the current retroactive paper claims process, and the delay in obtaining pharmaceutical reimbursement. "The majority of the clinics had not been historically responsible for floating pharmaceutical costs, and expressed significant concerns over clinic operational costs if HIV medications clinics were reimbursed retroactively through the [paper-based] process." Waiting for reimbursement for a $10 drug was different than waiting for reimbursement of a $1,500 drug. The majority of the existing Community Partner clinics did not operate onsite pharmacies and had utilized community pharmacies that billed the state directly through the state's AIDS Assistance Drug Program (ADAP). "From this meeting, it was clear that DHS needed to identify a 340B contract pharmacy network strategy, and [taking into] consider[ation] the size of the [Healthy Way LA] clinic/pharmacy network," the impact of access to medication in light of the Healthy Way LA program."

Healthy Way LA's pharmaceutical access goals were to (1) ensure access to the 340B clinic pricing; (2) provide a method to ensure the clinic's ability to adhere to HRSA 340B regulations, (3) provide a method for real-time electronic claims adjudication for HIV pharmaceuticals, and (4) minimize interruption to patient care services. Each Community Partner clinic is considered a separate covered entity required to maintain separate inventory transaction records to meet federal regulations, and therefore DHS concluded pharmacy administrative services were necessary. Gutierrez determined that DHS did not have the infrastructure necessary to perform the required services, namely, real-time claims adjudication and virtual inventory software that would comply with the 340B processing, the maintenance of multiple separate unrelated retail pharmacy 340B inventories, electronic verification of formulary and clinical drug utilization review, and the ability to process prospective claims. "Given that each separate entity is responsible for tracking compliance to ensure that all 340B regulations are closely followed for each medication transaction, it was considered critical to provide real-time online access to monitor 340B inventory use when the clinic utilized multiple offset contract pharmacies that provide dug dispensing for all of its outside business." DHS elected to use those pharmacies already part of the Healthy Way LA

network rather than a single 340B entity in order to avoid disrupting patient-clinic relationships and care access.

Healthy Way LA required a 340B program administrator who could perform the following services that DHS was unable to perform due to lack of access to the necessary infrastructure and a robust platform:

1. "340B contract pharmacy network management and development for in-house retail, community, and chain pharmacies."

2. "Ability to accept and manage real-time electronic claims from more than 60 retail pharmacies across the network and adjudicate for patient eligibility, clinical, formulary, and financial parameters for each separate clinic site."

3. "Ability to maintain separate virtual 340B clinic medication inventories for 20 clinic sites, and more than 60 separate pharmacy locations, including the tracking of partial inventory accumulation over a 6-month period." Any "retail pharmacy site may handle separate virtual inventory and wholesaler replenishment for one site, multiple sites, or all [clinics]."

4. "Ability to track individual 340B clinic inventories across a multiple-pharmacy contract network that complies with HRSA regulations."

5. "Ability to order 340B drugs on behalf of the 340B covered entity to the drug wholesaler, manage orders, and serve as the wholesaler fiscal intermediary of each clinic incorporating 'ship to-bill to' logic."[5]

6. "Ability to accept daily [Healthy Way LA] eligibility files, upload, and make available for pharmacy claims adjudication on the same day of receipt to ensure that patients [have] access to critical medication."

7. "Ability to exchange eligibility data between ADAP and [Healthy Way LA] programs to direct the [Healthy Way LA] contract pharmacy to the appropriate payor, and prevent duplicate billing to state and County on the same transaction."

---

[5] This terminology denotes that the good itself is sent to one address, while the invoice is sent to another address.

8. "Ability to provide data management services and system for program invoicing and reporting[, and] to ensure that each 340B covered entity had access to necessary contract pharmacy reports in accordance with HRSA regulations."

9. "Ability to assess and adjudicate claims based on 'lesser of logic,' [namely,] running each claim through [three] potential claims scenarios and identifying the lowest cost to [Healthy Way LA]."

10. "Ability to provide traditional pharmacy benefit management . . . services (help desk, claims adjudication, maximum allowable cost . . . management, and pharmacy network payment."

Due to the shortened timeline for the Ryan White to Healthy Way LA transition, DHS had to identify a vendor that possessed the necessary infrastructure and experience in handling 340B contract pharmacy network between multiple 340B covered entities and a variety of different retail pharmacies. For DHS, a solicitation normally takes one year to complete, and thus, there was insufficient time to issue a solicitation for this temporary service.

Ramsell had acted as a pharmacy administrator for the State of Oregon and Colorado, as well as acted as California's ADAP contract administrator. "Ramsell already had contracts within all of the HIV specialty and retail pharmacy locations being considered for [Healthy Way LA], and would be able to implement the 340B contract pharmacy administrator services within 60 [to] 90 days of contract implementation, given the existing infrastructure already in place."

Gutierrez pointed out that AHF did not assert that it had software or systems in place to handle the necessary 340B compliance when the clinic and the pharmacy are not owned by the same entity, which is the case for many Healthy Way LA clinic sites. Finally, the drug reimbursement the Ramsell system provides is the 340B drug cost at the time the drug is dispensed, but the State has paid more historically under the ADAP program. Thus, the Ramsell program would save money.

16

### (C) AHF'S REPLY

Donna Stidham's reply declaration stated that the qualifications of Ramsell versus AHF were not at issue in the litigation, but whether the contract requires extraordinary professional or technical services, a fact that Gutierrez did not address. Further, AHF runs each of its 10 pharmacies as a separate 340B entity and acts as a pharmacy benefit manager for each of those pharmacies. Each pharmacy had its own inventory controls, ordering needs, eligibility list, and drug reconciliations, all of which AHF managed and coordinated as any pharmacy benefit manager would. In addition, AHF disputed whether a pharmacy benefit management needed to be 340B qualified. Rather, it is the responsibility of the 340B-eligible entity to ensure that its pharmacies comply with 340B, and it is not the responsibility of the pharmacy benefit manager. Further, only 2,500 of the approximately 5,000 new LIHP patients in Los Angeles County will be served by the Ramsell contract because AHF already handles the other 2,500.

Primarily, however, AHF asserted that "the sole operational difference between the existing paper-based system and the system contemplated under the Ramsell contract is that the [pharmacy benefit manager] under the Ramsell contract organizes the relevant data on computers. The County does not, and cannot, contend that the use of computers has added *any* substantive duties to the task of pharmacy administration in Los Angeles County, much less any 'extraordinary professional or technical' duties." Further, the exemption for services that cannot be performed by county employees did not refer to the availability of infrastructure.

### (D) TRIAL COURT RULING

On June 5, 2013, the trial court found the County had a ministerial duty to submit the contract for competitive bidding pursuant to Los Angeles County Code section 2.121.310, and that the County's determination that it was not required to do so was not supported by substantial evidence. The court found the exception for contracts to perform personal services that were of an extraordinary professional or technical nature and were temporary (L.A. County Code, § 2.121.250, subd. (B)(3)) did not apply. The court observed that "[a]lthough

17

an agency's discretion is entitled to deference upon review, as explained above, deviations from strict adherence to competitive bidding standards receive close judicial scrutiny" and "exceptions to competitive bidding requirements should be strictly construed."

The court noted that what constitutes a personal service contract is defined by the traditional legal definition of a personal service, namely, "'[a]n act done personally by an individual. In this sense, a personal service is an economic service involving either the intellectual or manual personal effort of an individual, as opposed to the saleable product of the person's skill,'"" and cited *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1092. The County placed particular emphasis on Ramsell's information technology and organizational structure, but the County Code exclusion for personal services contracts "does not appear to apply to a contract to purchase or lease information technology or a contract to gain access to the preexisting organizational structure of a business."

Further, even if the contract could be construed as one for personal services, the exclusion would not apply because the service to be performed under the Ramsell II contract was not of an extraordinary professional or technical nature. Donna Stidham's declaration set forth substantial familiarity with health plan administration and pharmacy benefit administration, and "provides an accurate rendition and thorough explanation of most of the contractual obligations of [Ramsell] under the contract." Those tasks included:

1. Maintenance of a patient database. "The maintenance tasks are not extraordinary; they essentially involve creating a database from a list of eligible patients already maintained by [the County] and updating it on a monthly basis with patients enrolled . . . . The determination of eligibility is not made by [Ramsell] but by the [County], [hence] the task essentially amounts to transcribing names or importing an electronic file of names from [Ramsell]." Due to Ramsell's lack of discretion to determine eligibility, the service it provided was not extraordinary. "Nor does it appear to be particularly professional or technical, considering the basic level of computer skills that a modern worker is presumed to possess."

18

2. Maintaining a formulary. The maintenance of such a formulary was similarly administrative and noncomplex. The determination of those drugs to be included in the formulary, and ensuring that only those drugs included in the formulary are being prescribed, were determined by the County, not Ramsell, and were thus not extraordinary or technical tasks.

3. Claims processing. These tasks basically involved "verification and cross-checking and intermediate level mathematical calculations based upon various parameters and lists provided by the County," including patient eligibility, the medication is part of the formulary, the patient is authorized to receive the drug in question, any refill is permitted, and the requested medication does not exceed quantity limits. "The tasks required by the contract essentially involve the aggregation and organization of data from multiple sources and the performance of basic logical calculations based on other parties' guidelines." "'Real time adjudication'" according to Stidham meant "not adjudication in any meaningful judicial sense, but basically involves assessing whether a pharmacy should be given 'the green light' to dispense the requested drugs to a patient based on an assessment of the requested prescription in light of the eligibilities indicated in the lists provided by the County." Thus, there was nothing extraordinary about these services.

4. Inventory management. These tasks involved taking replenishment orders from pharmacies and submitting them to drug wholesalers, tracking the inventories of contract pharmacies with reference to processed claims and inventory levels. The court accepted Stidman's description of these services and her assertion that there were not extraordinary as accurate. "These tasks appear to involve ordinary computer skills and ordinary management and organization skills," plus there was a level of automation in Ramsell's information technology which would aid the employees in performing these tasks.

5. Reporting. These tasks only require aggregation and transmission of information that the system automatically collects, and is not an extraordinary or exceptional task.

With respect to the proprietary Ramsdell software, such software could be easily duplicated by commercially available software. Finally, "Modern information technology

19

makes management and administration of information such as the sort contemplated here a task that is not extraordinary, even if its scale is extensive."

In conclusion, the court stated that "[t]here is no indication in any of the [County's] papers that Respondent DHS ever undertook any serious analysis of whether the contract qualified under [Los Angeles County Code section] 2.121.250[, subdivision] (B)(3) before requesting approval of the contract from the Board." The County's own "sole source checklist" omitted the "extraordinary" requirement and indicated that the contract should be awarded because the County needed to take action because the first contact was rejected.

With respect to the temporary exception of Los Angeles County Code section 2.121.250, subdivision (B)(2), the court noted that neither party contested whether the contract fit under this exception.

On June 5, 2013, the trial court issued a writ of mandate. The trial court entered judgment on June 18, 2013.

## DISCUSSION

The County contends the trial court employed the wrong standard of review because it failed to accord the appropriate deference to the agency's decision, and improperly reviewed the basis for the County's decision, not the County's ultimate decision. The County further argues that Ramsell II was exempt from competitive bidding because it was a personal services contract that (1) could not be performed by County employees in the time available; (2) involved services of an extraordinary professional or technical nature, and (3) remedied an emergency situation that required quick action. Finally, the County asserts that voiding Ramsell II on the very last day of its existence made a mockery of the equitable nature of the mandate remedy.

AHF attacks the Ramsell II contract on many fronts. First, it contends the trial court properly refused to apply the "arbitrary and capricious" standard to questions of statutory construction. In any event, the trial court's interpretation of Los Angeles County Code section 2.121.250, subdivision (B)(3) is consistent with the relevant provisions of the County Code, which specifically refer to services, not information technology. Second, on the merits, the

20

Gutierrez declaration did not provide an evidentiary basis for concluding that the Ramsell II contract was for extraordinary professional or technical services. Further, there was no evidence that County employees could not perform the services contemplated under the Ramsell II contract or recruit employees to perform them; indeed, in *Ramsell I* the court pointed out that it was "difficult to imagine why County employees" could not perform the services called for because they were not "novel or cutting edge." Lastly, Los Angeles County Code section 2.121.250 provides no "quick action" situation, and in any event, there was no emergency situation other than that of the County's own creation because there was no legal requirement to provide services to HIV/AIDS patients on a computer-based system, and there was sufficient time to bid the contract.

## I.    Standard of Review and Principles of Statutory Construction

"A public entity's 'award of a contract, and all of the acts leading up to the award, are legislative in character.' (*Santa Ana Tustin Community Hospital v. Board of Supervisors* (1982) 127 Cal.App.3d 644, 652.)" (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 (*Mike Moore's 24-Hour Towing*).) "Review of a local entity's legislative determination is through ordinary mandamus under [Code of Civil Procedure] section 1085." (*Ibid.*) "'Such review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support. [Citation.]' This test has also been formulated to add an inquiry whether the agency's decision was 'contrary to established public policy or unlawful or procedurally unfair.'" (*Ibid.*) "Indeed, such nonadjudicatory acts 'are accorded the most deferential level of judicial scrutiny.'" (*Khan v. Los Angeles City Employees' Retirement System* (2010) 187 Cal.App.4th 98, 106.)

In *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, the court explained the function of a traditional writ of mandate. "A writ of mandate will lie to 'compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station' [citations] 'where there is not a plain, speedy, and adequate remedy, in the ordinary course of law.' (Code Civ. Proc., § 1086.) Code of Civil Procedure section 1085 permits judicial review of ministerial duties as well as quasi-legislative and legislative acts.

[Citation.] A trial court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference. This question is generally subject to de novo review because it is one of statutory interpretation, a question of law for the trial court. [Citations.] [¶] A ministerial duty is one which is required by statute. 'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment.' [Citations.] [¶] Normally, mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner. However, it will lie to correct abuses of discretion. [Citation.] In determining whether a public agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.] A court must ask whether the public agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the agency failed to follow the procedure and give the notices the law requires. [Citation.] [¶] In applying this extremely deferential test, a court '"must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute."' [Citation.] Deferential review of quasi-legislative activity minimizes judicial interference in the interests of the separation of powers doctrine. [Citation.]" (*Id.* at pp. 653–654.)

Whether the statutory provisions "impose a ministerial duty, for which mandamus will lie, or a mere obligation to perform a discretionary function is a question of statutory interpretation." (*AIDS Healthcare Foundation v. Los Angeles County Department of Public Health* (2011) 197 Cal.App.4th 693, 701.) To that end, "'We examine the "language, function and apparent purpose"' of the statute. [Citation.] . . . 'Even if mandatory language appears in [a] statute creating a duty, the duty is discretionary if the [public entity] must

22

exercise significant discretion to perform the duty.' [Citation.] Thus, in addition to examining the statutory language, we must examine the entire statutory scheme to determine whether the [entity] has discretion to perform a mandatory duty." (*Ibid.*)

Our "inquiry is whether the record shows a reasonable basis for the action of the legislative body, and if the reasonableness of the decision is fairly debatable, the legislative determination will not be disturbed." (*Mike Moore's 24-Hour Towing*, *supra*, 45 Cal.App.4th at pp. 1305–1306.) We will "look beyond the findings and conclusions of the trial court, where the record shows that the question is debatable and there may be a difference of opinion on the subject. [Citation.] In essence, the question is whether substantial evidence supports the agency's decision [citation], although it has also been stated that 'what constitutes reasonable evidentiary support may vary depending upon the nature of the action.' [Citation.] In a challenge to a legislative decision, the petitioner has the burden of proof to show that the decision is unreasonable or invalid as a matter of law[, [citation] and] '"[t]here is a presumption that the [agency] ascertained the existence of necessary facts to support its action, and that the 'necessary facts' are those required by the applicable standards which guided the [agency]. [Citations.]" [Citation.]'" (*Id*. at p. 1306.) We "'will tend to defer to the presumed expertise of the agency acting within its scope of authority.' [Citation.] Thus, the agency is required to consider all relevant factors, and on appeal a rational connection must be demonstrated between those factors, the choice made, and the purposes of the statute under which the agency was acting. [Citation.]" (*Ibid.*)

"In statutory construction cases, our fundamental task is to ascertain the intent of the legislature in order to effectuate the purpose of the statute. [Citation.] [To that end,] '[w]e begin by examining the statutory language, giving the words their usual and ordinary meaning.' [Citations.] If the terms of the statute are unambiguous, we presume the legislature meant what it said, and the plain meaning of the language governs. [Citations.] If [the statute] is ambig[uous], however, we may then look to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] . . . [W]e ""select the construction that comports most closely with the apparent intent of the Legislature, with a

23

view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.""''" (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911.)

## II.    The Ramsell II Contract Was Exempt from Competitive Bidding Under Los Angeles County Code Section 2.121.250, Subdivisions (B)(2) and (B)(3)

Here, our analysis turns on the application of the correct standard of review to the County and DHS's actions in approving and letting the Ramsell II contract. We apply principles of statutory construction, which are legal questions, to the threshold question of what is meant by the statute's use of the words "extraordinary" and "professional" or "technical" services. To the secondary question of whether the County's evidence met the statutory definitions, we apply a more deferential standard and determine whether substantial evidence supported the County's findings and whether it abused its discretion in bypassing the competitive bidding requirements of its own charter. We are concerned only with whether, after determining the meaning of the relevant statutory terms and in complying with such meanings, the County acted in an arbitrary and capricious manner and without any evidentiary support in entering into the no-bid contract. In conclusion we find that after giving the words "extraordinary" and "professional" or "technical" meanings which are consistent with the intent of the County's Charter provisions to promote competitive bidding (see *Domar Electric v. City of Los Angeles*, *supra*, 9 Cal.4th at p. 175), the County did not act in an arbitrary and capricious fashion or without any evidentiary support by entering into the Ramsell II contract. On the contrary, because the County determined that no other entity could provide the necessary services due to their extraordinary and technical nature, it acted within its statutory mandate.

### A.    The Contract Was for Personal Services

A personal service is "'"[a]n act done personally by an individual. In this sense, a personal service is an economic service involving either the intellectual or manual personal effort of an individual, as opposed to the salable product of the person's skill.' (Black's Law Dict. (9th ed.2009) p. 1260, col. 1.)" (*City of Monterey v. Carrnshimba*, *supra*, 215

Cal.App.4th 1091–1092.) In *Cobb v. Pasadena City Board of Education* (1955) 134 Cal.App.2d 93, the court considered whether a school board was required to seek competitive bids to employ an architect to prepare plans for the school's expansion. (*Id.* at p. 94.) *Cobb* reiterated the principle that it was well settled that "because an architect is an artist, that his work requires taste, skill and technical learning and ability of a rare kind, it would be bad judgment to advertise and get many bids when the lowest bidder might be also the least capable and most inexperienced and his bid absolutely unacceptable." Thus, "'the employment of a person who is highly and technically skilled in his science or profession is one which may properly be made without competitive bidding.' [Citation.]" (*Id.* at p. 95.) Notably, *Cobb* rejected the contention that the competitive bidding requirement for construction contractors automatically meant that an architect's services could only be employed by competitive bidding. "Where competitive proposals do not produce an advantage, a statute requiring competitive bidding does not apply." (*Ibid.*)

Similar considerations apply here. The attractiveness of Ramsell was two-fold: (1) the provision of proprietary software designed to manage a large platform of computer-related pharmacy database services, and (2) support and training for those persons actually in the pharmacies using the Ramsell software. Thus, merely because the Ramsell contract envisioned the use of a product, namely, software or hardware, that did not take the contract out of the realm of "personal services." Rather, the contract contained a hybrid of product and service that could not be separated. Thus, the contract was not a contract for a product.

Further, although the contract provided a mechanism for the processing and ordering of a commodity, namely, pharmaceuticals, it did not have as its object the manufacture of such pharmaceuticals and there is no evidence that Ramsell obtained any profit from the sale of such pharmaceuticals. Instead, Ramsell was an intermediary through which pharmaceutical orders could be tracked and placed in an efficient fashion and prescriptions could be filled in a manner that would cause minimal disruption to the patients. Ramsell received approximately $60,000 per month for its services and the cost of the pharmaceuticals—in which it had no

stake—comprising the bulk of the contract's cost, namely, an estimated $5.9 million per month.

**B.      *Ramsell's Services Were of an Extraordinary Professional or Technical Nature***

We find no case construing the language of Los Angeles County Code section 2.121.250, subdivision (B)(3) that the services be "of an extraordinary professional or technical nature."  However, we must read this requirement to incorporate the underlying principle that the purpose of competitively bidding jobs that County employees could do is that those jobs should go to County employees; thus, if third parties are to be used, the services they provide must be "extraordinary"—namely, County employees cannot currently perform such services because the County does not currently perform such tasks or cannot do so given the kind and scope of services at issue.  Although the record is unclear how many persons are actually employed by Ramsell to perform pharmacy administrator services under the Ramsell II contract, it is highly likely that many of the persons using the Ramsell propriety software are not Ramsell employees at all, but contract pharmacy employees and employees of wholesale drug manufacturers.  As such, those persons are by definition not County employees.  On the other hand, those persons actually employed by Ramsell (such as support staff and installers) by definition would have specialized knowledge about the program not possessed by any County employee.  (*Domar Electric, Inc. v. City of Los Angeles*, *supra*, 9 Cal.4th at p. 173 ["'Competitive bidding provisions must read in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny municipalities authority to deal with problems in a sensible, practical way.'"].)

The legislative history offers no insight on the intended scope of the defined exceptions to the competitive bidding requirements; however, the legislative history discloses the main impetus behind Proposition A was the decline in County revenues following the passage of Proposition 13.[6]  Since then, County revenues continue to

---

[6] The current version of Los Angeles County Code section 2.121 had its genesis in the wake of the enactment of tax-cutting Proposition 13.  "Proposition 13 was a reaction against

fluctuate, but given the increased use of private contractors, the current version of Los Angeles County Code section 2.121.250, enacted in 1990, provides that the decision to contract out is guided by considerations additional to pure monetary concerns. Thus, the language regarding "extraordinary technical or professional services," reflects an awareness that the County is not always equipped to perform the required services. Indeed, section 44.7 permits independent contractors where the work would not only be more economically performed, but also where the work would be "more feasibly performed." Such is the case here: The Ramsell II contract was a superior method of implementing the Bridge to Reform. The Ramsell II contract provides for a unique data collection function that is intrinsic to its value. Ramsell provided services that ensured program drugs were timely ordered and remained in stock, as well as services that ensured the section 340B price was obtained. Inasmuch as we have concluded that the services provided by Ramsell employees cannot be severed from the Ramsell proprietary software, this data collection function would be an ongoing part of the prescription-filling process for patients transisitioning to the LIPH program. Such a function is a highly specialized feature of the Ramsell software specifically designed to ensure timely ordering and filling of prescriptions for those patients receiving governmental financial assistance.

Finally, the County submitted evidence that in its search for an appropriate entity to use for the transition from Ryan White to Healthy Way LA, it found only Ramsell met its specifications for efficiency, accuracy, and data collection, and only Ramsell had the right business model to provide the services. Given the County's expertise in the area of providing pharmaceuticals to low income patients, this decision was entitled to greater deference. On

the increasingly costly and unsatisfactory services of California's local governments. Now Proposition A, which will appear on the November ballot, is proposing the most effective way to meet the stringent demands of Proposition 13: Use the energies and methods of the private sector—businesses and individual citizens—to do more of the tasks that local governments now perform so inefficiently." (Popper, *A Private Solution to a Public Problem*, L.A. Times (July 26, 1978) p. F5.) The voters in Los Angeles County passed Proposition A. The most recent version of the enabling legislation was adopted by the supervisors on March 13, 1990. (L.A. County Ord. § 90-0030, § 3.)

this record, there is no evidence the County's actions were arbitrary and capricious or lacking in evidentiary support in selecting a vendor that it deemed was the only entity properly equipped to provide needed IT services for pharmacy administration. (*Mike Moore's 24-Hour Towing*, *supra*, 45 Cal.App.4th at p. 1303.)

For these reasons, we reject AHF's arguments. First, AHF appears to argue that because AHF operates a paper-based system, the County is obligated to do so as well in implementing the Bridge to Reform. We disagree. "[M]andate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner. However, it will lie to correct abuses of discretion." (*County of Los Angeles v. City of Los Angeles*, *supra*, 214 Cal.App.4th at p. 654.) One of the considerations facing the County was efficiency and cost-cutting and seamlessness in the provision of medications, and its evidence supported its conclusion that the Ramsell contract would ease the transition of HIV/AIDS patients to the Healthy Way LA program. Further, restraining the County in its choice of platforms in which to secure the best-priced medications and timely service does not serve the interests of such patients.

We conclude that in construing the exception of Los Angeles County Code section 2.121.250, subdivision (B)(3) very narrowly and with an improper focus on the exact nature of the tasks performed, rather than a consideration whether such tasks could or would actually be performed by County employees, and ignoring the County's own assessment of the situation which it faced and the need for the kind of specialized proprietary software and services that Ramsell offered, the trial court erred. We reverse and direct the trial court to enter judgment for the County.[7] (Code Civ. Proc., § 43.)

---

[7] Lastly, because we conclude the trial court erred on the merits, we need not consider Ramsell's equitable argument that the Court's ruling was contrary to equitable mandamus principles.

28

## DISPOSITION

The judgment is reversed.  The trial court is directed to enter judgment for the Appellants.  Appellants are to recover their costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.