Filed 12/15/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| FAIR EDUCATION SANTA BARBARA,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SANTA BARBARA UNIFIED SCHOOL DISTRICT et al.,<br><br>    Defendants and Respondents. | 2d Civ. No. B309248<br>(Super. Ct. No. 19CV01875)<br>(Santa Barbara County) |

      Fair Education Santa Barbara, Inc. (FESB) appeals from the judgment after the trial court denied its petition for writ of mandate (Code of Civ. Proc.,[1] § 1085), seeking to invalidate two one-year contracts between respondents Santa Barbara Unified School District/former-Superintendent Cary Matsuoka

---

      [1] Further unspecified statutory provisions are to the Code of Civil Procedure.

(collectively SBUSD) and Just Communities Central Coast, Inc. (JCCC).  We affirm.[2]

## FACTUAL AND PROCEDURAL HISTORY

FESB is a coalition of residents and taxpayers in Santa Barbara County.  SBUSD is a public school district in Santa Barbara County.  JCCC is an organization that provides anti-bias training and educational programs to school districts and other organizations.  JCCC has worked with SBUSD on various training programs since 2005.  In 2013, an evaluation of JCCC's programs revealed that it made a "measurable contribution to Latino [s]tudent [a]chievement" within SBUSD.

JCCC provides anti-bias training for educators which focuses on issues of diversity, equity, and inclusion.  The main purpose of the anti-bias training is to "eradicate the persistent educational achievement gap among minority students."  JCCC facilitators have specialized training and knowledge of the local community and culture.  JCCC draws upon research from a variety of fields and from leading authorities in diversity education.  The facilitators are required to participate in 60 hours of training (or its equivalent) and participate in an additional eight to 12 hours of specialized training for the educator program.  Most trainers have a bachelor's or master's degree, and some are former educators.  Many trainers live in and/or have worked locally and have attended SBUSD schools or have worked for them.  JCCC's program has been used in other local school districts, governmental entities, and non-profit organizations.

---

[2] SBUSD moved to dismiss this appeal on the ground that it was moot.  We deny the motion and exercise our discretion to decide this appeal.  (*Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 318.)

With a goal to close educational performance gaps and eliminate institutional biases, SBUSD elected to provide diversity, equity, and inclusion training to its teachers and staff, and made such training available to students and parents. JCCC had a variety of programs. One program was designed to help SBUSD educators "develop a cultural proficiency and equity lens" and another program was designed to help educators create a culturally relevant curriculum. JCCC also had programs to help SBUSD "develop a larger number of skilled interpreters" and "ensure key district personnel understand and implement best practices for working with interpreters." JCCC also provided student and parent programs on inclusion and equity training. In addition, JCCC offered "customized professional development" services and ongoing coaching to SBUSD staff. According to former Superintendent Matsuoka and SBUSD's board of directors, no SBUSD staff members or other public resources were available to provide comparable training to its educators, students, and parents.

In October 2018, SBUSD approved a one-year contract for the 2018-2019 school year with JCCC for anti-bias training services. In May 2019, SBUSD approved another one-year contract for the 2019-2020 school year with JCCC. Both contracts were approved without public bidding.

FESB petitioned for a writ of mandate against SBUSD and JCCC, alleging that the contracts were void because they were not subject to public bidding pursuant to Public Contract Code section 20111.

The trial court denied the petition. It found that SBUSD's decision to contract with JCCC was a "quasi-legislative" act that was subject to a "deferential standard under which the

Court looks only to whether the FESB has met its burden of establishing that SBUSD's action was arbitrary, capricious or entirely lacking in evidentiary support."

Applying a deferential standard, the court found there was a "reasonable basis for SBUSD's actions in concluding that the services were not subject to the public bidding requirements . . . because they constitute 'professional services' within the meaning of subdivision (d)" of Public Contract Code section 20111. The court also found that JCCC's services constituted "special services" under Government Code section 53060. The court also noted that "it appears likely that JCCC's unique understanding of and ability to address the issues of race and privilege in the local Santa Barbara community, as well as its customized programming designed to address the achievement gap experienced by minority students in the area by providing trainings directed not just to educators, but to students and parents as well, may well render it the only contractor capable of providing the services which SBUSD has made a policy decision to provide." "Under these circumstances, it may well be true that 'the nature of the subject of the contract is such that competitive proposals would be unavailing or would not produce an advantage, and the advertisement for competitive bidding would thus be undesirable, impractical, or impossible.'"

## DISCUSSION

FESB contends the trial court erred when it (1) reviewed SBUSD's action under a deferential standard, (2) found that the contract met the exemption[3] for "professional services"

---

[3] The trial court explained that exemptions occur when "competitive bidding requirements do not apply in the first instance" (e.g., the statutory "professional services" exemption).

4

(Pub. Contract Code, § 20111, subd. (d)), (3) found that the contract met the exemption for "special services" (Gov. Code, § 53060), and found that competitive bidding would be "undesirable, impractical, or impossible." We conclude otherwise.

### Competitive Bidding Requirements

Public Contract Code section 20111 requires that the "governing board of any school district . . . shall let any contracts involving an expenditure of more than fifty thousand dollars ($50,000)" for the purchase of equipment, materials, supplies, certain repairs, or *services*, "to the lowest responsible bidder . . . or else reject all bids." (Pub. Contract Code, § 20111, subd. (a)(1) and (2), italics added.) These bidding requirements "shall not apply to *professional services* or advice." (*Id*. at subd. (d), italics added.) In addition, Government Code section 53060 permits a legislative body of any public corporation or district to "contract with and employ any persons for the furnishing [of] . . . special services and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the special services required." (See also *California Sch. Employees Assn. v. Sunnyvale Elementary School District* (1973) 36 Cal.App.3d 46, 60-62 (*Sunnyvale Elementary*); see also *Cobb v. Pasadena City Board of Education* (1955) 134 Cal.App.2d 93, 96 (*Cobb*) [contract for "special services" is exempt from competitive bidding requirements].)

---

An exception is made when the competitive bidding requirements apply, but certain circumstances exist (e.g., an emergency exception) that permit an entity to forgo competitive bidding. We will use the same terminology.

5

The purpose of competitive bidding is "'to guard against favoritism, improvidence, extravagance, fraud and corruption; to prevent the waste of public funds; and to obtain the best economic result for the public' [citation], and to stimulate advantageous market place competition." (*Domar Electric, Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 173 (*Domar*).) Competitive bidding provisions are strictly construed by the courts, but will not be construed in a manner that will defeat their purpose. (*Ibid*.) Such provisions must be read "'in the light of the reason for their enactment, or they will be applied where they were not intended to operate and thus deny [the public entity's] authority to deal with problems in a sensible, practical way.' [Citation.]" (*Ibid*.)

### *Applicable Standards of Review*

FESB argues the trial court erroneously applied a deferential standard of review to SBUSD's decision to enter a no-bid contract with JCCC. It argues that public contracts subject to competitive bidding receive "'close judicial scrutiny.'" We conclude the trial court applied the correct standard.

"A writ of mandate may be issued by any court . . . to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station." (§ 1085.) "The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law." (§ 1086.)

The trial court's standard of review in a mandamus proceeding depends upon the nature of the agency's action. Pursuant to section 1085, a court may review both an agency's "ministerial duties" and "quasi-legislative" actions. (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643,

6

653.)  The trial court must "determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference."  (*Ibid*.)  A ministerial duty is one "'that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.  Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment.' [Citations.]"  (*Id*. at pp. 653-654.)

The "'appropriate level of degree of judicial scrutiny in any particular case is perhaps not susceptible of precise formulation, but lies somewhere along a continuum with nonreviewability at one end and independent judgment at the other.' [Citation.]  Quasi-legislative administrative decisions are properly placed at that point of the continuum at which judicial review is more deferential; ministerial and informal actions do not merit such deference, and therefore lie toward the opposite end of the continuum."  (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 575-576.)

In reviewing a denial of a writ of mandamus, we review factual findings for substantial evidence and legal issues de novo.  (*Stryker v. Antelope Valley Community College Dist.* (2002) 100 Cal.App.4th 324, 329 (*Stryker*).)

The question of whether an entity's action was ministerial or quasi-legislative is a question of statutory interpretation, which we review de novo.  (*County of Los Angeles v. City of Los Angeles*, *supra*, 214 Cal.App.4th at p. 653.)  ""We examine the 'language, function and apparent purpose'" of the

statute.  [Citation.] . . .  "Even if mandatory language appears in [a] statute creating a duty, the duty is discretionary if the [public entity] must exercise significant discretion to perform the duty." [Citations.]  Thus, in addition to examining the statutory language, we must examine the entire statutory scheme to determine whether the [entity] has discretion to perform a mandatory duty.'  [Citation.]"  (*Weinstein v. County of Los Angeles* (2015) 237 Cal.App.4th 944, 965 (*Weinstein*).)

*Weinstein, supra,* 237 Cal.App.4th 944, decided a similar issue of whether a trial court applied the proper standard to review the County's award of a no-bid contract.  There, the County awarded a pharmacy administrator a contract after determining it was exempt from competitive bidding because the services constituted "personal services" of a "temporary" and "extraordinary professional or technical" nature (L.A. County Code, § 2.121.250).  (*Weinstein*, at p. 952.)  The trial court issued a writ of mandate, finding that the County had a "ministerial duty" to submit the contract to competitive bidding.  The court "'strictly construed'" the exemption and found the exemption for "temporary" and "professional or technical" services did not apply.  (*Id.* at p. 961.)

The Court of Appeal reversed, concluding that the trial court erred in construing the exemption "very narrowly" and "ignoring the County's own assessment of the situation which it faced and the need for the kind of specialized [products] and services that [the pharmacy administrator] offered."  (*Weinstein, supra,* 237 Cal.App.4th at p. 970.)  The court explained that a "'public entity's "award of a contract, and all of the acts leading up to the award, are legislative in character."  [Citation.]' [Citations.]"  (*Id.* at p. 964.)  Such review of a local entity's

8

legislative determination is ""'"limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support.  [Citation.]" [Citation.].""" (*Ibid*.)  Ordinarily, "'mandate will not lie to control a public agency's discretion . . . .  However, it will lie to correct abuses of discretion.  [Citation.]'" (*Id*. at p. 965.)  Such deferential review of quasi-legislative activity "'minimizes judicial interference in the interests of the separation of powers doctrine.  [Citation.]'  [Citation.]" (*Ibid*.)

Thus, in a challenge to a quasi-legislative decision, the petitioner has the burden of proving the agency's decision is unreasonable or invalid as a matter of law, and there is a presumption that the agency ascertained sufficient facts to support its action.  (*Weinstein*, *supra*, 237 Cal.App.4th at p. 966.)  If the record reflects "'a reasonable basis for the action of the legislative body, and if the reasonableness of the decision is fairly debatable, the legislative determination will not be disturbed.'  [Citation.]" (*Id*. at p. 965.)

Where there is an issue of statutory interpretation, courts will review such questions de novo and apply the "principles of statutory construction." (*Weinstein*, *supra*, 237 Cal.App.4th at p. 966.)  Thus, de novo review applies to the question of what is meant by the statute's use of the words "extraordinary" and "professional" or "technical'" services.  (*Ibid*.)  But the "deferential standard" applies to determine whether the County's evidence met the statutory definitions and "whether it abused its discretion in bypassing the competitive bidding requirements of its own charter." (*Id*. at pp. 966-967.)

Here, the trial court applied the same standards of review used in *Weinstein*, *supra*, 237 Cal.App.4th 944.  Like

9

*Weinstein*, SBUSD's action involved the entry into a no-bid contract after SBUSD assessed its need for the anti-bias training services that JCCC provided. The trial court correctly determined that such an action was quasi-legislative. With respect to questions of statutory interpretation, such as the definition of "professional services" and "special services," the trial court properly applied de novo review. It examined the statutory language with "the fundamental task [of] ascertain[ing] the intent of the lawmakers so as to effectuate the purpose of the statute." To decide whether SBUSD appropriately met the statutory definitions in bypassing the competitive bidding process and entering into the JCCC contract, the court applied a "deferential standard under which the Court looks only to whether the FESB had met its burden of establishing that SBUSD's action was arbitrary, capricious or entirely lacking in evidentiary support, and whether SBUSD failed to conform to procedures required by law." (Compare *Weinstein*, *supra*, 237 Cal.App.4th at p. 964.)

Relying on *Konica Business Machines U.S.A. Inc. v. Regents of University of California* (1988) 206 Cal.App.3d 449 and *Schram Construction Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040, FESB argues that contracts subject to competitive bidding statutes must receive "'close judicial scrutiny.'" Those cases are inapposite. They involved instances where a project was submitted for public bidding but the public entity failed to comply with bidding procedures and compromised a fair and impartial bidding process. (*Konica*, at p. 451 [bid protest alleging that the winning bid did not conform to specifications set forth by the University]; *Schram*, at pp. 1052-1053 [bid protest of a mechanical and plumbing contract alleging

10

that the University did not comply with bidding requirements].) Under circumstances where there was a "potential for abuse arising from deviations" from competitive bidding procedures, the "letting of public contracts" received "close judicial scrutiny." (*Konica*, at p. 456.)

FESB also cites *Marshall v. Pasadena Unified School District* (2004) 119 Cal.App.4th 1241 (*Marshall*) and *Great West Contractors, Inc. v. Irvine Unified School Dist.* (2010) 187 Cal.App.4th 1425, to argue that the trial court's standard of review should be less deferential. Those cases are not only factually distinguishable, they do not articulate a different standard of review than the one applied here. (*Marshall*, at p. 1253 [issues of statutory interpretation were reviewed de novo but review of a legislative determination was limited to an inquiry of whether the act was arbitrary, capricious, or entirely lacking in evidentiary support].)

FESB also argues that the letting of a contract for public bidding is a ministerial duty. This argument lacks merit. SBUSD exercised its discretion when it selected JCCC to provide anti-bias training and determined that such a contract need not be publicly bid. (See *Weinstein*, *supra*, 237 Cal.App.4th at pp. 967, 969 [selecting a vendor that the County deemed was the "only entity properly equipped to provide" certain services for "pharmacy administration" was a discretionary act]; see also *Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 [the city's award of a towing contract and decision to reject protests to the contract were legislative actions]; *Marshall*, *supra*, 119 Cal.App.4th at p. 1253 [school board's resolution awarding a contract without public bidding was a legislative decision].)

11

### *Exemptions from Competitive Bidding*

FESB contends the trial court erred in finding that the JCCC contracts fell within (1) the "professional services" exemption, (2) the "special services" exemption, and (3) the common law exemption. We are not persuaded.

At the outset, FESB argues that the trial court erred in determining that "the competitive bidding requirement itself—and not the exemption—be strictly construed." But the authorities FESB cites do not support its argument.

FESB relies on *Domar*, *supra*, 9 Cal.4th 161, in which our Supreme Court explained that competitive bidding requirements fulfill the "'purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest.'" (*Id*. at p. 173.) To effectuate their purpose, competitive bidding requirements, which include specific procedures an entity and prospective bidders must follow, must be strictly construed. (*Ibid*.) However, nothing in *Domar* states that exemptions to competitive bidding requirements must also be so construed.

FESB also relies on *Marshall*, *supra*, 119 Cal.App.4th at p. 1256, which involved a construction contract that clearly fell within the scope of the competitive bidding statute. There, the contract was awarded to the lowest bidder, but was later terminated after several change orders. (*Id*. at p. 1246.) Instead of submitting the contract for rebid, the school district relied

12

upon a statutory exception for "emergencies" and awarded the contract to a new contractor without competitive bidding. (*Ibid*.) The Court of Appeal held that "given the strong public policy favoring competitive bidding, the emergency exception thereto should be strictly construed and restricted to circumstances which truly satisfy the statutory criteria." (*Id*. at p. 1256.) Under those circumstances, because the "purported emergency stemmed from the District's decision to terminate its contract with [the lowest bidder] for the District's own 'convenience[,]' [t]hat event was not a 'sudden, unexpected occurrence'" that met the statutory definition for an emergency. (*Id*. at p. 1258.)

*Marshall*, *supra*, 119 Cal.App.4th 1241 is distinguishable. Here, the question is whether competitive bidding requirements apply *in the first instance*. (See *Unite Here Local 30 v. Department of Parks & Recreation* (2011) 194 Cal.App.4th 1200, 1210 [distinguishing *Marshall*].)

Moreover, as we will explain in our discussion of the "special services" exemption, several cases illustrate instances where the courts did not narrowly construe the exemption to competitive bidding requirements. (See *post*, at pp. 19-20; see also *Weinstein*, *supra*, 237 Cal.App.4th at p. 970 [concluding that the trial court erred in construing an exemption "very narrowly"].)

*1. Professional Services Exemption*

FESB contends the trial court erred in determining the "professional services" exemption applied. (Pub. Contract Code, § 20111, subd. (d).) We disagree.

Subdivision (d) of Public Contract Code section 20111 states that the public bidding requirement of subdivision (a) does not apply where the contract is for "*professional services* or

13

advice, insurance services, or any other purchase or service otherwise exempt from this section." (Italics added.) The scope of "professional services" presents a question of statutory interpretation which we review de novo. When interpreting a statutory term, our fundamental task is to ascertain the Legislature's intent to effectuate the purpose of the statute. (*Weinstein*, *supra*, 237 Cal.App.4th at p. 966.) We begin by examining the statutory language, giving terms their plain, ordinary meaning. If the language is ambiguous, we may look to extrinsic sources, including legislative history. We select the construction that comports most closely with the intent of the Legislature, with a view of promoting, rather than defeating, the general purpose of the statute, and avoiding an interpretation that would lead to absurd results. (*Ibid.*)

### a. Definition of Professional Services

"Professional services" is not defined in Public Contract Code section 20111, nor has any court defined the term in this context. In ascertaining a term's ordinary meaning, courts often turn to general and legal dictionaries. (See *De Vries v. Regents of University of California* (2016) 6 Cal.App.5th 574, 590-591.) Merriam-Webster Law Dictionary defines "professional services" as "a service requiring specialized knowledge and skill usually of a mental or intellectual nature and usually requiring a license, certification, or registration." (Merriam-Webster Law Dict. Online (2021) <https://www.merriam-webster.com/legal/professional%20service> [as of Dec. 13, 2021], archived at <https://perma.cc/N389-96MP>.) Similarly, the term "professional" in Black's Law Dictionary is defined as "someone who belongs to a learned profession or whose occupation requires a high level of training and proficiency." (Black's Law

14

Dictionary (11th ed. 2019).)  The term "professional" in Merriam-Webster's Dictionary is defined as "relating to a job that requires special education, training, or skill."  (Merriam-Webster Dict. Online (2021) <https://www.merriam-webster.com/dictionary/professional> [as of Dec. 13, 2021], archived at <https://perma.cc/6CEB-WT6N>.)

Cases that have defined the term "professional services" have adopted similar definitions.  Here, the trial court identified two cases, *Hollingsworth v. Commercial Union Ins. Co.* (1989) 208 Cal.App.3d 800, 806 and *Tradewinds Escrow, Inc. v. Truck Ins. Exchange* (2002) 97 Cal.App.4th 704, 713, which involved insurance policies that excluded coverage for "professional services," which was not defined by the policies. The courts defined "professional services" as "'one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.'"

In summary, the definition of "professional services" is one that requires specialized knowledge, training, or skill, usually of a mental or intellectual nature.  While one dictionary definition states that such services "usually" require license, certification, or registration, "usually" denotes something that is not always required.  This definition comports with the general legislative intent to give school districts deference in governing (see Ed. Code, § 35160, et. seq.), while not defeating the purpose of competitive bidding requirements.  It is reasonable to assume that the Legislature intended to give school districts the ability to enter contracts for services which require a specialized level of skill, knowledge, and training, especially in instances where

15

awarding such a contract to the lowest bidder could produce undesirable results.  This interpretation is also consistent with common law exemptions where the nature of a contract is such that competitive proposals "would not result in any advantage to the public entity in efforts to contract for the greatest public benefit."  (*Graydon v. Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 636; see also *Miller v. Boyle* (1919) 43 Cal.App.39, 44 [recognizing that advertising for skilled services such as an architect may result in the lowest bidder being the "'least capable and most inexperienced, and absolutely unacceptable'"].)

FESB argues that "professional services" providers most necessarily hold a license, certification, or registration authorized by statute.  In support of its argument, FESB uses the definition in Corporations Code section 13401, subdivision (a).[4]  We disagree.

Corporations Code section 13401 specifically limits its scope to "this part" of the Corporations Code (i.e., the Moscone-Knox Professional Corporation Act).  FESB offers no authority to support the proposition that this definition applies to the Public Contract Code.  As the trial court observed, the Corporation Act and its purpose "bears no relationship to the public bidding requirements."  Moreover, FESB cites no other authority to support the proposition that the Public Contract

---

[4] Corporations Code section 13401 states that "[*a*]*s used in this part* . . . [¶] . . . 'Professional services' means any type of professional services that may be lawfully rendered only pursuant to a license, certification, or registration authorized by the Business and Professions Code, the Chiropractic Act, or the Osteopathic Act."  (Italics added.)

16

Code exemption requires the existence of a license, certification, or registration.

### b. JCCC's Services Were Professional Services

The trial court determined that SBUSD's finding that JCCC's services were "professional services," "was not arbitrary or capricious, and was not entirely lacking in evidentiary support." The record supports this determination.

The evidence showed JCCC facilitators had specialized training, knowledge, and skills that met SBUSD's specific need for providing anti-bias training to its staff, students, and parents. Many of JCCC's facilitators were former educators who held a bachelor's degree or other advanced degrees. Each facilitator was required to undergo 60 hours of training or its equivalent, and even more hours of specialized training for the educator program. The facilitators lived locally and either attended or worked in local school systems, which gave them insight into the local community and its needs. JCCC's facilitators had experience training other local school districts, governmental entities, and organizations. Based on these facts, SBUSD's decision that JCCC's services were "professional services" was reasonable. (See *Weinstein*, *supra*, 237 Cal.App.4th at p. 965 [legislative decision will not be disturbed if the record reflects a reasonable basis].)

### 2. *Special Services Exemption*

Even if JCCC's services did not constitute "professional services," SBUSD's action was exempt from competitive bidding requirements for a second reason: JCCC's services were "special services" pursuant to Government Code section 53060.

17

Government Code section 53060 permits entities such as SBUSD to contract with persons who furnish "special services and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the special services required." "Special services" are exempt from competitive bidding requirements pursuant to Public Contract Code section 20111, subdivision (a). (See *Cobb*, *supra*, 134 Cal.App.2d at p. 96 ["special services" exemption applied to bidding requirements under former Ed. Code, §§ 18051 & 18052, repealed and now incorporated into Pub. Contract Code, § 20111 (Stats. 1943, c. 71, p. 661, amended by Stats. 1953, c. 340, p. 1607, § 1)].) The services provided here clearly satisfied these requirements.

a. Definition of Special Services

Whether services are "special services" pursuant to Government Code section 53060 "depends on the nature of the services; the necessary qualifications required of a person furnishing the services; and the availability of the service from public sources." (*Sunnyvale Elementary*, *supra*, 36 Cal.App.3d at p. 60.) The temporary nature of services also may be considered as a factor. (See *Jaynes v. Stockton* (1961) 193 Cal.App.2d 47, 52.) The question of whether services are "special services" is a question of fact which we review for substantial evidence. (*Sunnyvale Elementary*, at p. 61; *Stryker*, *supra*, 100 Cal.App.4th at p. 329.)

FESB argues that JCCC's services are not "special services" because they do not fall into the specifically listed categories of "financial, economic, accounting, engineering, legal, or administrative matters." (Gov. Code, § 53060.) But, as discussed above, only the competitive bidding requirements, and

18

not the exemptions, are strictly construed. (See *ante*, at pp. 12-13.) Several cases have interpreted this exemption broadly.

For example, in *Cobb*, *supra*, 134 Cal.App.2d at pp. 95-96, the court upheld a school board's decision to award a contract to an architect without competitive bidding. In interpreting Government Code section 53060, the court explained that the "statute removes all question of the necessity of advertising for bids for 'special services' by a person specially trained and experienced and competent to perform the special services required. Now, a board may pay from any available funds a fair compensation to capable and worthy persons for special services." (*Cobb*, at p. 96.) Architectural services are not specifically listed as one of the exempt categories in the statute. Nevertheless, the court interpreted the exemption to include services that require special training where competitive bidding of such services would not produce an advantage, including architectural services. (*Id*. at p. 95.)

In *Sunnyvale Elementary*, *supra*, 36 Cal.App.3d 46, the court held that research and development services provided by a private company constituted "special services." The research company provided a collective of school districts the ability to obtain the "results of massive research and development that are unavailable from public sources and which research and development no individual school district could afford to undertake on its own." (*Id*. at p. 54.) Such projects involved research and development into various areas of school operations, including custodial operations. (*Ibid*.) Because the evidence showed that the company's personnel were "'professional, highly trained and educated, experienced and extremely competent in the fields in which they render said services'" and there was no

19

evidence that similar services were available form public sources, the services were properly deemed "special services." (*Id*. at p. 61.)

In *Service Employees Internat. Union v. Board of Trustees* (1996) 47 Cal.App.4th 1661, 1674, a contract with Barnes & Noble to operate college campus bookstores was determined to be a contract for "special services" pursuant to Government Code section 53060. The facts showed that "Barnes & Noble provide[d] the District with the services of professional, experienced and specially trained personnel" which could not otherwise be provided by other personnel. (*Service Employees Internat.*, at pp. 1673-1674.) The services included regular visits from Barnes & Noble regional and senior managers to ensure the store was operating according to the college district's standards, program training for store management, a computerized textbook management system, a guaranteed supply of used books, access to the company's inventory to avoid out-of-stock problems, and a computerized ordering system. (*Id*. at p. 1673.)

In sum, these cases illustrate that courts have not strictly interpreted "special services" or limited the definition to the specifically listed categories.

b. JCCC Services Were "Special Services"

SBUSD's determination that the "special services" exemption applied was not an arbitrary or capricious one, and the evidence supports this finding. First, the nature of the services was specialized to SBUSD. Many of the facilitators, who were former educators and worked in/had attended SBUSD schools, had a "unique understanding of" the issues in the local Santa Barbara community and could customize their training programs to address those issues. Second, JCCC was specially qualified to

20

provide services to SBUSD because of its facilitators' trainings, educational and employment backgrounds, connections to the local community, and experience working with other local school districts and organizations. Third, SBUSD's board and superintendent declared that there were no public resources available to provide comparable services, and FESB provided no evidence to the contrary.

### 3. *Common Law Exemption*

Finally, FESB argues the trial court erred in finding the common law exemption to competitive bidding applied.[5] We note that because the trial court found the "professional services" and "special services" exemptions applied, it found it "unnecessary" to make an explicit finding on whether the common law exemption applied. For that reason, we need not resolve this claim.

### DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.

CERTIFIED FOR PUBLICATION.

TANGEMAN, J.

We concur:

GILBERT, P. J.          PERREN, J.

---

[5] A common law exception applies "where the nature of the subject of the contract is such that competitive proposals would be unavailing or would not produce an advantage, and the advertisement for competitive bid would thus be undesirable, impractical, or impossible." (See *Graydon v. Pasadena Redevelopment Agency*, *supra*, 104 Cal.App.3d at pp. 635-636.)

21

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____

Early Sullivan Wright Gizer & McRae, Eric P. Early and Peter D. Scott for Plaintiff and Appellant.

Griffith & Thornburgh, Craig Price and Austin S. Payne for Defendants and Respondents Santa Barbara Unified School District and Cary Matsuoka.

Kirkland & Ellis, Allison W. Buchner; Perkins Coie, Sarah E. Piepmeier, Elise Edlin, May Eaton and Andrew Taylor Ohlert for Defendant and Respondent Just Communities Central Coast, Inc.